1   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - - - x
3
    In re:
4
                                          Chapter 11
5
    MPM SILICONES, LLC, et al.,           Case No. 14-22503-rdd
6
                 Debtors.
7

8
    - - - - - - - - - - - - - - - - - -x
9
    B E F O R E :
10
    HON. ROBERT D. DRAIN
11
    U.S. BANKRUPTCY JUDGE
12

13
    Corrected and Modified Bench Ruling on Confirmation of Debtors'
14
    Joint Chapter Plan of Reorganization for Momentive Performance
15
    Materials Inc. and its Affiliated Debtors.
16

17
    A P P E A R A N C E S :
18
    WILLKIE FARR & GALLAGHER, LLP
19          Attorneys for Debtors
            787 Seventh Avenue
20          New York, NY 10019
21   BY:    MATTHEW A. FELDMAN, ESQ.
22
    UNITED STATES DEPARTMENT OF JUSTICE
23          Office of the United States Trustee
            210 Varick Street
24          Room 1006
            New York, NY 10014
25

```
 1     BY:    BRIAN S. MASUMOTO, ESQ. (TELEPHONICALLY)

 2
       MILBANK, TWEED, HADLEY & MCCLOY LLP
 3             Attorneys for Ad Hoc Committee of Second Lien Holders
               One Chase Manhattan Plaza
 4             New York, NY 10005

 5     BY:    DENNIS F. DUNNE, ESQ.

 6
       MILBANK, TWEED, HADLEY & MCCLOY LLP
 7             Attorneys for Ad Hoc Committee of Second Lien Holders
               1850 K Street, NW
 8             Washington, DC 20006

 9     BY:    ANDREW M. LEBLANC, ESQ.

10
       QUINN EMANUEL URQUHART & SULLIVAN, LLP
11             Attorneys for U.S. Bank, N.A.
               51 Madison Avenue
12             22nd Floor
               New York, NY 10010
13
       BY:    SUSHEEL KIRPALANI, ESQ.
14

15     ROPES & GRAY LLP

16             Attorneys for Wilmington Trust, Trustee of 1.5 Notes
               1211 Avenue of the Americas
17             New York, NY 10036

18     BY:    MARK I. BANE, ESQ.

19
       AKIN GUMP STRAUSS HAUER & FELD LLP
20             Attorneys for Apollo
               One Bryant Park
21             New York, NY 10036

22
       BY:    ABID QURESHI, ESQ.
23             PHILIP C. DUBLIN, ESQ.
               IRA S. DIZENGOFF, ESQ.
24

25     IRELL & MANELLA LLP
```

```
 1          Attorneys for Bank of New York Mellon Trust Company
            1800 Avenue of the Stars
 2          Suite 900
            Los Angeles, CA 90067
 3
    BY:   JEFFREY REISNER, ESQ. (TELEPHONICALLY)
 4        ALAN J. FRIEDMAN, ESQ. (TELEPHONICALLY)

 5
    DECHERT LLP
 6          Attorneys for First Lien Trustee
            1095 Avenue of the Americas
 7          New York, NY 10036

 8    BY:   MICHAEL J. SAGE, ESQ.

 9
            Good afternoon.  We are back on the record in In re
10
    MPM Silicones, LLC.  I had adjourned my bench ruling on
11
    confirmation of the debtors' chapter 11 plan and the related
12
    rulings in the three adversary proceedings to give the parties
13
    another day to see if they could negotiate, as between the
14
    first and the 1.5 lien holders and the debtors and the second
15
    lien holders' representatives, any settlement of their issues.
16
    I gather, since you're all here and looking fairly stony faced,
17
    that hasn't happened?
18
            Okay.  All right.  So, I will give you my ruling on
19
    confirmation.
20
            I am going to give what will sound like a series of
21
    bench rulings on five issues that remain open regarding
22
    confirmation of the chapter 11 plan and, with respect to the
23
    subordination of the senior subordinated unsecured notes, or
24
    the extent of that subordination, and the extent of the so-
25
```

1    called make-whole provisions in the first and 1.5 lien

2    indentures, in the three related adversary proceedings covered

3    by my prior order on confirmation hearing procedures.   The

4    context of each of these rulings, however, is my ruling on

5    confirmation of the debtors' chapter 11 plan, as it has been

6    modified on the record a couple of times during the

7    confirmation hearing.

8         I have reviewed all of the evidence submitted in

9    connection with the debtors' request for confirmation of the

10   plan, which includes not only the live trial record of the

11   four-day confirmation hearing held last week, but also the

12   declarations, exhibits, including expert reports, and

13   deposition testimony that was admitted into evidence during

14   that time.   It's clear to me that, except for the issues that I

15   am about to rule on and the one other issue that I ruled on

16   last week, namely, the absolute priority rule objection to

17   confirmation of the plan raised by the subordinated

18   noteholders, which I decided in favor of the debtors, there are

19   no disputes as to the confirmation of the plan.   And, having

20   reviewed the record, I am prepared to make the findings under

21   section 1129(a) of the Bankruptcy Code required for

22   confirmation, leaving aside, again, the five issues that I am

23   going to address this afternoon.

24        I clearly have jurisdiction with regard to those

25   issues, which arise under sections 510(a), 502(b)(2), 506(b),

1    1129(a) and (b) of the Bankruptcy Code, pursuant to 28 U.S.C.

2    sections 157(a)-(b) and 1334(b), as these issues arise under

3    the Bankruptcy Code and in the chapter 11 case, let alone that

4    they're clearly related to the chapter 11 case.

5          As I noted, two of the issues also arise in three

6    adversary proceedings, and at least one of the parties in those

7    proceedings has stated, as required under the Local Rules, its

8    view that the Court lacks the power to issue a final order or

9    final determination of the issues in that proceeding. Absent

10   the Supreme Court's ruling in Stern v. Marshall, 131 S. Ct.

11   2594 (2011), there would be no question that I have such power,

12   as these are all core matters under 28 U.S.C. section

13   157(b)(2), each pertaining to confirmation of the debtors' plan

14   and/or the treatment of the claims of the first lien holders,

15   1.5 lien holders, second lien holders and subordinated

16   noteholders.

17         I continue to have the power to issue a final order on

18   these issues on a Constitutional basis under Stern v. Marshall.

19   The issues all involve fundamental aspects of the adjustment of

20   the debtor/creditor relationship.  Colloquially, they pertain

21   to how the pie of the bankruptcy estate will be divided among

22   the groups of claimants that I just listed, not whether the

23   estate will be augmented by a claim against a third party.

24   Moreover, the issues clearly pertain to rights unique to

25   bankruptcy law under section 1129(b) of the Bankruptcy Code and

1    sections 1129(a)(1) and 510(a) of the Code, as well as the

2    treatment of claims under sections 502(b)(2) and 506(b) of the

3    Code.  Accordingly, under Stern v. Marshall, 131 S. Ct. 2618, I

4    have the power to issue a final order or determination on these

5    issues notwithstanding that this is an Article I, not an

6    Article III, court.

7         These rulings, as will ultimately be memorialized in

8    an order on confirmation as well as orders in respect of the

9    three adversary proceedings, in each case will be a final

10   determination by the Court.

11        Before I get to the rulings, I also want to note that

12   I am providing a bench ruling here in recognition of the need

13   for a prompt determination in this case of these issues, after

14   having established a complete record and thought about them, I

15   hope, thoroughly.  These are ongoing businesses with thousands

16   of employees as well as hundreds if not thousands of creditors

17   and customers, and they deserve a prompt response.  As I noted

18   yesterday, when I give a bench ruling, at times the ruling can

19   be lengthy with significant citation; and in those instances I

20   normally go over the transcript and reserve the right to

21   correct it not only as to inaccuracies by the court reporter,

22   but also as to content, whether I said something

23   ungrammatically, for example, or whether I wanted to say

24   something slightly differently.  If I do edit the ruling on the

25   latter two grounds, I will separately file it as a modified

1   bench ruling.  It won't be the transcript at that point; it

2   will instead be a modified bench ruling, although the holdings

3   on these issues won't change.

4

5        Let me turn to the first issue, which involves, as

6   noted, the extent of the subordination of the senior

7   subordinated unsecured notes.  This issue comes up in Adversary

8   Proceeding No. 14-08238 under section 510(a) of the Bankruptcy

9   Code, which provides, "A subordination agreement is enforceable

10  in a case under this title to the same extent that such

11  agreement is enforceable under applicable nonbankruptcy law."

12  It is also integral to the Court's consideration of the

13  debtors' request for confirmation of the chapter 11 plan,

14  because the plan has a specific interpretation of the extent of

15  the subordination of the senior subordinated notes that the

16  subordinated noteholders disagree with and provides, based on

17  that interpretation, that there will be no distribution to the

18  senior subordinated noteholders in recognition of the debtors'

19  view, supported by the second lien holders, that their

20  subordination agreement requires that any distribution that

21  would otherwise go to them would have to be distributed instead

22  to the second lien holders in full.

23       It thus serves as a gate-keeping issue for

24  confirmation of the plan, because section 1129(a)(1) of the

25  Bankruptcy Code provides that, to be confirmed, the plan must

1    comply with the applicable provisions of the Code, which

2    include section 510(a).

3        The outcome hinges primarily if not entirely on

4    interpretation of the relevant agreement, the senior

5    subordinated unsecured note indenture, which, as all of the

6    parties recognize, is governed by New York law.  They also

7    recognize that, when interpreting the indenture, the Court

8    should apply basic New York contract law.  See In re AMR Corp.,

9    730 F.3d, 88, 98 (2d Cir. 2013), citing, among other cases,

10   Sharon Steel Corp. v. Chase Manhattan Bank N.A., 691 F.2d 1039,

11   1049 (2d Cir. 1982).

12       Those basic contract interpretation principles are

13   well established. Under New York law, the best evidence, and,

14   if clear, the conclusive evidence, of the parties' intent, is

15   the plain meaning of the contract.  Thus, in construing a

16   contract under New York law, the Court should look to its

17   language for a written agreement that is complete, clear, and

18   unambiguous on its face; and, if that is the case, it must be

19   enforced according to its plain terms.  J. D'Addario & Company

20   Inc. v. Embassy Industries, Inc., 20 N.Y.3d 113, 118 (2012);

21   Greenfield v. Philles Records Inc., 98 N.Y.2d 562, 569 (2002).

22       A contract is ambiguous if its terms are "susceptible

23   to more than one reasonable interpretation."  Evans v. Famous

24   Music Corp., 1 N.Y.3d 452, 458 (2004); see also British

25   International Insurance Co. v. Seguros La Republica, S.A., 342

1    F.3d 78, 82 (2d Cir. 2003), stating, "an ambiguity exists where

2    the terms of the contract could suggest more than one meaning

3    when viewed objectively by a reasonably intelligent person who

4    has examined the context of the entire integrated agreement and

5    who is cognizant of customs, practices, usages and terminology

6    as generally understood in the particular trade or business."

7         Thus, while in instances of ambiguity the Court may

8    look to parole evidence, if the agreement on its face is

9    reasonably susceptible to only one meaning, that meaning

10   governs; a court is not free to alter the contract to reflect

11   its personal notions of fairness and equity. Greenfield v.

12   Philles Records Inc., 98 N.Y.2d at 569; see also In re AMR

13   Corp., 730 F.3d at 98.

14        Some additional points are worth emphasizing before

15   proceeding to the language of the indenture itself.  As noted

16   in several of the foregoing authorities, the context of the

17   entire agreement is important.  The courts have cautioned

18   (including when construing subordination language) that one

19   should not take an isolated provision that might be susceptible

20   to one or more readings out of context, but should apply it

21   instead in the context of the entire agreement, or construe

22   it in a way that is plausible in the context of the entire

23   agreement.  See, for example, Barclays Capital, Inc. v.

24   Giddens, 2014 U.S. App. LEXIS 15009, at *21 (2d Cir. Aug. 5,

25   2014); In re Tribune Company, 472 B.R. 223, 255 (Bankr. D. Del.

1   2012), aff'd in part, vacated in part on other grounds, 2014

2   U.S. Dist. LEXIS 82782 (D. Del. June 18, 2014).

3          It is also fundamental that every word of the

4   agreement should, to the extent possible, be given a meaning,

5   or, in other words, one of the most basic interpretive canons

6   is that a contract should be construed so that effect is given

7   to all of its provisions and no part will be inoperative or

8   superfluous or of no significance.  See, for example, LaSalle

9   Bank N.A. v. Nomura Asset Capital Corp. 424 F.3d 195, 206 (2d

10  Cir. 2005); Lawyers' Fund for Client Protection v. Bank Leumi

11  Trust Co. of New York, 94 N.Y.2d 398, 404 (2000).

12         It is also relevant, at least to confirm what appears

13  to be an unambiguous provision or set of provisions in a

14  contract, to consider the parties' interpretation of the

15  contract in practice before litigation with respect to the

16  underlying issue.  See, for example, In re Actrade Financial

17  Technologies, Ltd., 424 B.R. 59, 74 (Bankr. S.D.N.Y. 2009), and

18  In re Oneida, Ltd., 400 B.R. 384, 389 (Bankr. S.D.N.Y., 2009),

19  aff'd 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. January 22, 2010).

20         Finally, the Court may be assisted in its

21  understanding of the context of the contract by third party

22  commentaries, particularly by seemingly nonpartisan industry

23  groups like the ABA.  See, for example, In re Metromedia Fiber

24  Network, Inc., 416 F.3d 136, 139-40 (2d Cir. 2005), as well as,

25  at least when a contract's meaning is being clarified in

1   context, Quadrant Structured Products Co., Ltd. v. Vertin, 2014

2   N.Y. LEXIS 1361, at *31-2 (N.Y. June 10, 2014).

3        Having laid out these basic contract interpretation

4   principles, let me turn to the language of the senior

5   subordinated unsecured note indenture itself, noting first that

6   both sides in this dispute have taken the position that these

7   terms, although their import is disputed, are, in fact,

8   unambiguous and susceptible to a plain meaning reading.

9        The operative paragraph providing for the

10  subordination of the senior subordinated unsecured notes is

11  Section 10.01 of the indenture, which provides in relevant

12  part, "The Company [meaning the issuer/debtor] agrees, and each

13  Holder, by accepting a Security agrees, that the Indebtedness

14  evidenced by the Securities, is subordinated in right of

15  payment, to the extent and in the manner provided in this

16  Article 10, to the prior payment in full of all existing and

17  future Senior Indebtedness of the Company and that the

18  subordination is for the benefit of and enforceable by the

19  holders of such Senior Indebtedness.  The Securities shall in

20  all respects rank pari passu in right of payment with all the

21  existing and future Pari Passu Indebtedness of the Company and

22  shall rank senior in right of payment to all existing and

23  future Subordinated Indebtedness of the Company; and only

24  Indebtedness of the Company that is Senior Indebtedness of the

25  Company shall rank senior to the Securities in accordance with

1    the provisions set forth herein."

2            "Indebtedness" is defined in the indenture at page 19

3    as "(1) the principal and premium (if any) of any

4    indebtedness" -- lower case i -- "of such Person whether or not

5    contingent, (a) in respect of borrowed money, (b) evidenced by

6    bonds, notes debentures or similar instruments or letters of

7    credit or banker's acceptances (or, without duplication,

8    reimbursement agreements in respect thereof), (c) representing

9    the deferred or unpaid purchase price of any property," and

10   other types of debt not relevant hereto;

11           and then, in paragraph (2), "to the extent not

12   otherwise included, any obligation" -- lower case o -- "of such

13   Person to be liable for, or to pay, as obligor, guarantor or

14   otherwise, on the Indebtedness of another Person (other than by

15   endorsement of negotiable instruments for collection in the

16   ordinary course of business);

17           "(3) to the extent not otherwise included,

18   Indebtedness of another Person secured by a Lien" -- uppercase

19   L -- "on any asset owned by such Person (whether or not such

20   Indebtedness is assumed by such person); provided, however,

21   that the amount of such Indebtedness will be the lesser of: (a)

22   the Fair Market Value of such asset at such date of

23   determination, and (b) the amount of such Indebtedness of such

24   other Person;"

25           and then (4), another type of indebtedness that is not

1   relevant here; and there is a proviso that's also not relevant

2   here, with respect to contingent obligations as deferred or

3   prepaid revenues of purchase price holdbacks.

4          It is clear, therefore, from a plain reading of

5   Section 10.01 of the indenture and the definition of

6   "Indebtedness" that the indenture and, in particular, its

7   subordination provision, provides for debt or claim

8   subordination, not lien subordination.

9          There is a good example in the record of lien

10  subordination, which I will get to, in the form of the

11  Intercreditor Agreement among the second lien holders and the

12  senior lien holders, as well as the debtors.  However, it is

13  clear from the subordination provision of Section 10.01 and the

14  definition of "Indebtedness" that I previously quoted that the

15  subordination of the senior subordinated unsecured notes is a

16  subordination in respect of the payment of debt, and that the

17  parties distinguished liens, which secure indebtedness, from

18  indebtedness itself in several instances in the indenture,

19  including in the definition of "Indebtedness" and "Lien," which

20  is found on page 21 of the indenture:  "'Lien' means with

21  respect to any asset, any mortgage, lien, pledge, charge,

22  security interest or encumbrance of any kind in respect of such

23  asset, whether or not filed, recorded or otherwise perfected

24  under applicable law (including any conditional sale or other

25  title retention agreement, any lease in the nature thereof, any

1   option or other agreement to sell or give a security interest

2   in and any filing of or agreement to give any financing

3   statement under the Uniform Commercial Code (or equivalent

4   statutes) of any jurisdiction)."

5        Clearly, liens differ from indebtedness in common

6   parlance and as defined in the indenture.  Liens have a life of

7   their own; they are not a characteristic of indebtedness but,

8   rather, secure it.

9        Under Section 10.01 of the indenture, the senior

10  subordinated noteholders have subordinated their right to

11  payment of the debt owed to them to the extent provided for in

12  the indenture to the prior payment in full of all existing and

13  future "Senior Indebtedness."  The issue comes down to, then,

14  in large measure, the definition of "Senior Indebtedness" found

15  at page 32 of the indenture, which provides, "'Senior

16  Indebtedness' means all Indebtedness and any Receivables

17  Purchase Option of the Company or any Restricted Subsidiary,

18  including interest thereon (including interest accruing on or

19  after the filing of any petition in bankruptcy or for

20  reorganization relating to the Company or any Restricted

21  Subsidiary at the rate specified in the documentation with

22  respect thereto, whether or not a claim for post-filing

23  interest is allowed in such a proceeding) and other amounts

24  (including fees, expenses, reimbursement obligations under

25  letters of credit and indemnities) owing in respect thereof,

1    whether outstanding on the Issue Date or thereafter incurred,

2    unless the instrument creating or evidencing the same or

3    pursuant to which the same is outstanding expressly provides

4    that such obligations are subordinated in right of payment to

5    any other Indebtedness of the Company or such Restricted

6    Subsidiary, as applicable."

7        That last clause is the first proviso to "Senior

8    Indebtedness."  That is, Senior Indebtedness means all

9    Indebtedness "unless the instrument creating or evidencing the

10   same or pursuant to which the same is outstanding expressly

11   provides that such obligations are subordinated in right of

12   payment to any other Indebtedness of the Company."  In other

13   words, this first proviso states that indebtedness under the

14   senior subordinated unsecured notes will not be subordinated to

15   indebtedness under instruments that expressly provide that such

16   indebtedness is itself subordinated debt.

17       Next, the indenture's definition of "Senior

18   Indebtedness" sets forth a series of other exceptions or

19   provisos, stating, "provided, however, that Senior Indebtedness

20   shall not include, as applicable: (1) any obligation of the

21   Company to any Subsidiary of the Company other than any

22   Receivables Repurchase Obligation or any Subsidiary of the

23   Company to the Company or any other Subsidiary of the Company

24   [that is, intercompany debt is not Senior Indebtedness];

25       "(2) any liability for Federal, state, local, or other

1    taxes owed or owing by the Company or such Restricted

2    Subsidiary [that is, tax obligations are not Senior

3    Indebtedness];

4         "(3) any accounts payable or other liability to trade

5    creditors arising in the ordinary course of business (including

6    guarantees thereof or instruments evidencing such liabilities)"

7    [that is, trade debt is not Senior Indebtedness];

8         "(4) any Indebtedness or obligation of the Company or

9    any Restricted Subsidiary that by its terms is subordinate or

10   junior in any respect to any other Indebtedness or obligation

11   of the Company or such Restricted Subsidiary, as applicable,

12   including any Pari Passu Indebtedness;

13        "(5) Any obligations with respect to any Capital

14   Stock; or

15        "(6) any Indebtedness Incurred in violation of this

16   Indenture, but as to any such Indebtedness Incurred under the

17   Credit Agreement, no such violation shall be deemed to exist

18   for purposeless of this clause (6) if the holders of such

19   Indebtedness or their Representative shall have received an

20   Officer's Certificate to the effect that the Incurrence of such

21   Indebtedness does not (or, in the case of a Revolving Credit

22   Facility thereunder, the Incurrence of the entire committed

23   amount thereof at the date on which the initial borrowing

24   thereunder is made, would not) violate this Indenture."

25        The subordinated noteholders contend that clause (4)

1   of the definition of "Senior Indebtedness" which I have just

2   quoted provides that (notwithstanding clause 4's failure to

3   refer to liens) any indebtedness that would otherwise be Senior

4   Indebtedness would not have the benefit of the indenture's

5   subordination provision because of the fact that it is secured

6   by a junior lien

7            Again, clause (4) to this series of additional

8   provisos to the definition of "Senior Indebtedness" excludes

9   any "Indebtedness or obligation of the Company or any

10  Restricted Subsidiary that by its terms is subordinate or

11  junior in any respect to any other Indebtedness or obligation

12  of the Company or such Restricted Subsidiary, as applicable."

13           The subordinated noteholders contend (and it is

14  basically their only argument) that the foregoing "junior in

15  any respect" language would pick up, given the broad meaning of

16  "in any respect," liens that are junior to other liens, and

17  accordingly, indebtedness secured by such liens.

18           The debtors disagree, arguing that, when viewed

19  pursuant to the contract interpretation principles that I have

20  stated, clause (4) of this second group of provisos to the

21  definition of "Senior Indebtedness" pertains only to debt

22  subordination and not to lien subordination, consistent with

23  the distinction throughout the indenture between liens and

24  debt, on the one hand, and liens that secure such obligations,

25  on the other, starting with Section 10.01.

1          After reviewing the indenture and the commentaries and

2     other documents that were admitted into evidence in connection

3     with this dispute, I agree with the debtors' interpretation of

4     clause (4).  I do so for a number of reasons, but primarily

5     because of the wording of the clause itself and the fundamental

6     contract interpretation principle that no material term of an

7     agreement should be superfluous under one party's construction

8     where it has a meaning under the other's, or, in other words,

9     that the contract should be read to give effect to all of its

10    provisions. See, again, LaSalle National Bank Association v.

11    Nomura Asset Capital Corp., 424 F.3d at 206; Lawyers' Fund for

12    Client Protection v. Bank Leumi Trust Co., 94 N.Y.3d at 404.

13          Under the definition of Senior Indebtedness that I've

14    quoted, the parties first excluded Indebtedness where "the

15    instrument creating or evidencing the same or pursuant to which

16    the same is outstanding expressly provides that such

17    obligations are subordinated in right of payment to any other

18    Indebtedness of the Company."  Then, in clause (4) of the

19    definition, the parties further excluded "any Indebtedness or

20    obligation of the Company or a Restricted Subsidiary that by

21    its terms is subordinated or junior in any respect to any other

22    Indebtedness or obligation of the Company."  The subordinated

23    noteholders' reading of clause (4) would swallow up the first

24    exclusion that I have quoted.  That is, under their

25    interpretation, as long as any rights of a creditor are junior

1    to any other creditor's rights, such as in respect of a junior-

2    in-time or junior-by-agreement lien, the creditor's

3    indebtedness is not Senior Indebtedness entitled to the benefit

4    of section 10.01.  This broad reading of the exclusion in

5    clause (4) would render the definition's first exclusion of

6    expressly contractually subordinated debt superfluous.

7         On the other hand, the debtors' interpretation of

8    clause (4), which is that it applies to obligations that are by

9    their terms subordinate even if not expressly so stated in the

10   instrument creating the obligation, permits both exceptions to

11   "Senior Indebtedness" to have a separate purpose.  For example,

12   obligations made subordinate to other obligations in a separate

13   agreement, like an intercreditor agreement, or obligations that

14   do not expressly state that they are subordinate to other

15   obligations but are so by their terms, such as a "last out"

16   facility in which one tranche of debt is to be paid after the

17   rest of the debt under the same note, would fall within clause

18   (4)'s exception but not into the first, introductory exception

19   under the debtors' reading of the definition of Senior

20   Indebtedness.

21        The debtors' interpretation also tracks the plain

22   terms of clause (4), noting the difference between a debt and a

23   lien that secures a debt.  Thus clause (4) excepts from the

24   definition of "Senior Indebtedness "any Indebtedness or

25   obligation of the Company or a Restricted Subsidiary that by

1   <u>its</u> terms is subordinate or junior in any respect to any other

2   Indebtedness or obligation." (Emphasis added.) The

3   highlighted word "its" refers to the terms of the <u>Indebtedness</u>

4   or the <u>obligation</u> -- which are separate from the terms of a

5   lien, mortgage, security interest, encumbrance, etc. – as being

6   junior to any other Indebtedness or obligation, not to the

7   terms of a <u>lien</u> being junior to any other lien.

8        The debtors also correctly point out that the

9   commentary to the ABA model subordinated unsecured note

10  indenture, appearing in Committee on Trust Indentures and

11  Indenture Trustees ABA Section of Business Law, "Model

12  Negotiated Covenants and Related Definitions," 61 Bus. Law.

13  1439 (Aug. 2006), states that the form of clause (4) should be

14  omitted if the obligor is "issuing junior subordinated

15  securities." Id. at 62. Again, that is, the emphasis is on

16  debt subordination, not lien subordination, junior subordinated

17  securities being debt that is subordinated in any way by its

18  terms to other debt. The commentary does not state that the

19  clause should alternatively be omitted if the subordinated debt

20  is intended to be pari passu with debt secured by a lien junior

21  to another lien granted by the issuer.

22       The debtors' reading is also consistent with the rest

23  of the indenture and the context of its subordination

24  provision. The rationale, according to the subordinated

25  noteholders, of an additional carve-out from Senior

1    Indebtedness for indebtedness secured by a junior lien is the

2    concern that junior lien financings could effectively overcome

3    or get around or fit into a loophole in contracts pursuant to

4    which one group of debt holders subordinate their debt to

5    another.  The second lien indebtedness would be senior debt,

6    that is, layered ahead of the senior subordinated notes

7    although secured by only a junior lien that, based on the value

8    of the collateral, might be largely or entirely undersecured,

9    something that senior subordinated unsecured noteholders would

10   not necessarily want.

11        It does not appear, however, that there is any anti-

12   layering provision in this indenture responsive to that

13   underlying concern.  To the contrary, there are covenants in

14   the indenture that deal with the incurrence of additional debt,

15   in section 4.03, the incurrence of additional liens, in section

16   4.12, and a limitation, in section 4.13, on senior or pari

17   passu subordinated indebtedness that permit both the issuance

18   of the second lien notes and, more importantly, permit them to

19   be senior to the subordinated notes regardless of whether they

20   were secured by a lien.  Notwithstanding those specific

21   provisions, however, the subordinated noteholders have proposed

22   an interpretation of clause (4) in the definition of "Senior

23   Indebtedness" that would essentially override those provisions

24   and exclude the second lien notes from the benefit of Section

25   10.01 merely because they were secured.

1        Moreover, the commentary upon which the senior

2   subordinated noteholders base their argument that clause (4)

3   was intended to close a loophole presented by junior lien

4   financings points to the need, if one wants to exclude debt

5   secured by a junior lien from the benefit of a subordination

6   provision, to do so in an anti-layering covenant.

7        That is the case in the Fitch commentary, at page 275,

8   which is attached as Exhibit L to Mr. Kirpilani's declaration,

9   as well as the presentation to an American Bankruptcy Institute

10  panel from 2006 attached as Exhibit J to his declaration, at

11  pages 13-14.  Indeed, the Thompson Reuters Legal Solutions

12  Practical Law excerpt attached as Exhibit H to Mr. Kirpilani's

13  declaration states at pages 4-5 that the better solution to

14  deal with the concern about not being subordinated to second

15  lien debt would be to place the exclusion in the anti-layering

16  covenant itself or to add a new anti-layering provision.

17       The senior subordinated noteholders point to Section

18  1.04 of the indenture, which is entitled "Rules of

19  Construction" and includes as one of the parties' rules of

20  construction, in clause (f), the following: "[U]nsecured

21  Indebtedness shall not be deemed to be subordinate or junior to

22  Secured Indebtedness [and thus excluded from the definition of

23  Senior Indebtedness] merely by virtue of its nature as

24  unsecured Indebtedness."  They suggest that the absence of

25  another, similar provision in the indenture, which does appear

1    in the 2006 ABA's "Model Negotiated Covenants and Related

2    Definitions" discussion, 61 Bus. Law. at 71, providing that

3    "[S]secured Indebtedness shall not be deemed to be subordinate

4    or junior to any other secured Indebtedness merely because it

5    has a junior priority with respect to the same collateral,"

6    establishes, under the principle of expressio unius est exlusio

7    alterius, that the parties meant to exclude debt secured by a

8    junior lien from the reach of the subordination provision.

9         However, I disagree with that interpretation. It seems

10   to me that, instead, given the clear resolution of the parties'

11   anti-layering rights, the plain meaning of the definition of

12   "Senior Indebtedness" and the principle evident throughout the

13   indenture that liens secure debt and are not themselves debt,

14   there would be no need in the "Rules of Construction" section

15   to have such a provision specifically <u>include</u> debt secured by a

16   junior lien as Senior Indebtedness, in contrast to the need to

17   add Section 1.04(f), which pertains to debt, not liens. In any

18   event, it is clear from the ABA commentary, which dates from

19   August 2006 -- just a few months before the issuance of the

20   senior subordinated unsecured notes -- and other presentations

21   attached to Mr. Kirpilani's declaration that issues pertaining

22   to the subordination of unsecured debt to debt secured by

23   junior liens were still evolving when the senior subordinated

24   unsecured notes were issued; there was no well established

25   standard form that might add a meaningful context to the

1    indenture's plain terms and internal consistency.  Cf. Quadrant

2    Structured Products Co., Ltd. V. Vertin, 2014 N.Y. LEXIS 1361,

3    at *31-2 (relying, in addition to considerable precedent, on

4    model no-action clause produced by the Ad Hoc Committee for

5    Revisions of the 1983 Modified Simplified Indenture that

6    predated the indenture at issue by 10 years).

7          The subordinated noteholders' interpretation of

8    "Senior Indebtedness" also would lead, to the anomalous result

9    that their notes would be subordinated to senior unsecured debt

10   (in this case, as suggested above, including the second lien

11   debt, which, when issued, was unsecured because it had only a

12   springing lien), but would cease to be subordinated when that

13   lien sprung or when such debt was issued on a secured basis.

14   There is no logical reason for such a distinction,

15   notwithstanding the subordinated noteholders' attempt to find

16   one.

17         The subordinated noteholders next contend that, even

18   under the debtors' interpretation of "Senior Indebtedness," the

19   Intercreditor Agreement entered into among the debtors, the

20   second lien holders and the first lien and 1.5 lien holders,

21   among others, and attached as Exhibit C to Mr. Kirpilani's

22   declaration, goes beyond lien subordination (which I have found

23   does not fit within the exception to "Senior Indebtedness"),

24   providing, in essence, for the subordination of the second lien

25   holders' debt to the debt secured by the liens of the first and

1   1.5 lien holders and any other debt that might be secured by

2   senior liens.

3         The Intercreditor Agreement clearly does restrict the

4   rights of the second lien holders, two of those restrictions

5   having been highlighted by the suborindated noteholders. First,

6   it provides that the second lien holders' right to the shared

7   collateral is subordinate to the senior lien holders' right to

8   such collateral, even if it turns out that the liens securing

9   the senior lien debt are not perfected or enforceable.  Second,

10  it provides in paragraph 4.04 that the second lien holders

11  shall turn over to the senior lien holders any recoveries that

12  they obtain not only on account of their contractual liens on

13  the shared collateral, but also on account of judicial liens

14  that they may obtain.

15        However, contrary to the interpretation offered by the

16  subordinated noteholders that these provisions of the

17  Intercreditor Agreement are debt subordination provisions, they

18  pertain to lien subordination, governing rights in respect of

19  the shared collateral.  Intercreditor agreements of this nature

20  that pertain to secured creditors' lien rights are commonly

21  geared to those rights whether or not the liens are perfected.

22  The parties are certainly free to, and do, agree that their

23  contractual liens, which they have mutually verified, are

24  effective as among each other, even if such liens later prove

25  to be generally ineffective because of a debtor's lien

1   avoidance powers.  The focus still is on the collateral that

2   was agreed to be secured by the liens.  See In re Ion Media

3   Newworks, Inc., 419 B.R. 585, 594-95 (Bankr. S.D.N.Y. 2009)

4   ("By virtue of the Intercreditor Agreement, the parties have

5   allocated among themselves the economic value of the FCC

6   licenses as 'Collateral' (regardless of the actual validity of

7   liens in these licenses.)").

8           Similarly, it is typical of intercreditor agreements

9   among secured parties that rights to enforce interests in the

10   collateral are, as they are here, thoroughly addressed.

11   Accordingly, a provision stating that collections on a judicial

12   lien (as well as from enforcement of the second lien holders'

13   contractual lien) shall be turned over to the senior lien

14   holders are common in shared collateral agreements, given that

15   control over the collateral is a fundamental aspect of such

16   agreements.  See, for example the American Bankruptcy Institute

17   presentation attached as Exhibit I to Mr. Kirpilani's

18   declaration, at page 25, listing intercreditor agreement

19   provisions that promote "first lienholders' desire to 'drive

20   the bus' in respect to remedies against the shared collateral."

21           In contrast, Section 5.04 of the Intercreditor

22   Agreement provides that nothing in that agreement alters the

23   second lien holders' rights in their capacity as unsecured

24   creditors, again highlighting the distinction between lien

25   subordination and debt subordination.

1           While there is no interpretive language

2    contemporaneous with the parties' entry into the senior

3    subordinated unsecured note indenture, the parties' subsequent

4    actions further support the debtors' reading of the

5    subordination provision's reach. For example, a substantial

6    portion of the subordinated notes, roughly $118 million in face

7    amount, was exchanged in 2009 at a discount of at least 60

8    percent for second lien notes, which is inconsistent with the

9    subordinated noteholders' present argument that those notes are

10   pari passu.

11          In addition, the trustees for the senior subordinated

12   notes took no action with respect to the issuance of the second

13   lien debt or the springing of the lien securing it, although

14   arguably under the subordinated noteholders' current

15   interpretation the debtors' disclosures with respect to the

16   second lien notes -- that they were senior in right of payment

17   to the subordinated notes -- was inaccurate. It is clear from

18   the exhibits to the responses by the ad hoc committee of second

19   lien holders and Apollo, as well as the debtors' submissions,

20   that such disclosure was clear in the company's 8-K, 10-Ks, and

21   prospectuses.

22          It is also the case that, under the subordinated

23   noteholders' broad interpretation of clause 4's exception to

24   "Senior Indebtedness," the debt under the debtors' current

25   first and 1.5 lien notes also would not benefit from Section

1    10.01's subordination provision, notwithstanding that the

2    indenture's definition of "Designated Senior Indebtedness"

3    would include the first and 1.5 lien notes. In other words, the

4    definition of "Designated Senior Indebtedness" is not

5    integrated into the definition of "Senior Indebtedness" as

6    proposed by the subordinated noteholders, again rendering their

7    broad interpretation of clause 4's exception to such definition

8    highly unlikely in the context of the entire indenture.

9          The debtors, the ad hoc committee of second lien

10    holders, and Apollo in its capacity as a second lien holder

11    have also argued, in their briefs at least, that the

12    subordinated noteholders are estopped by laches or other

13    equitable principles from making the arguments that they are

14    making now, given their silence in the face of the issuance of

15    over a billion dollars of second lien debt that was widely

16    disclosed to be senior in right of payment to the senior

17    subordinated unsecured notes.  At oral argument, the debtors

18    and the second lien holders seem to have walked back on that

19    argument, however, and I believe that it would not apply here

20    under the case law, in any event, in light of the need to

21    establish conduct upon which reliance is based and the absence

22    of a factual record to show such reliance. See, for example,

23    River Seafoods, Inc. v. J.P. Morgan Chase Bank, 796 N.Y.S.2d

24    71, 74 (1st Dept. 2005) (stating elements of equitable estoppel

25    under New York law), and Eppendorf-Netheler-Hinz GMBH v.

1    National Scientific Supply Company Inc., 14 Fed. Appx. 102, 105

2    (2d Cir. July 13, 2001) (stating elements of laches under New

3    York law).

4         But, based on the plain meaning of Section 10.01 and

5    the definition of "Senior Indebtedness," and, secondarily, the

6    distinction throughout the indenture, as well as when the

7    relevant provisions are read context, between lien rights and

8    the subordination of debt, I conclude that the second lien

9    holders' notes are "Senior Indebtedness" and, therefore,

10   entitled to the benefit of the subordination provision of

11   Section 10.01 of the indenture.

12

13        The next two issues pertain to a different set of

14   agreements that are subject to the same rules of contract

15   interpretation that I've previously summarized and won't

16   repeat, as both operative sets of agreements -- indentures and

17   notes -- are governed by New York law.  The two issues involve

18   the rights of the indenture trustees, and therefore the

19   holders, of the first and 1.5 lien holders to a so-called

20   contractual "make-whole" claim, or, barring such a claim, a

21   common law claim for damages, based on the debtors' payment of

22   their notes before the original stated maturity of the notes.

23   The first and 1.5 lien holders' rights to such a claim are in

24   the first instance governed by the respective indentures and

25   notes, which, as relevant, contain the same provisions.

1           If, in fact, the trustees are entitled to such a claim

2   that is enforceable in bankruptcy, it will increase the amount

3   of the replacement notes to be issued to the first and 1.5 lien

4   holders as their distribution under the debtors' chapter 11

5   plan.   That is, the plan leaves open, now that the classes of

6   first and 1.5 lien holders have rejected the plan, for the

7   Court to decide whether the first and 1.5 lien holders' allowed

8   claim includes a make-whole amount, whereas, if those classes

9   had accepted the plan they would have received a cash

10  distribution in the amount of their allowed claims specifically

11  without any make-whole amount.

12          The indentures for both sets of notes provide in

13  Section 3.01, captioned "Redemption," that "the Notes may be

14  redeemed, in whole, or from time to time in part, subject to

15  the conditions and at the redemption prices set forth in

16  paragraph 5 of the form of Notes set forth in Exhibit A and

17  Exhibit B hereto, which are hereby incorporated by reference

18  and made a part of this Indenture, together with accrued and

19  unpaid interest to the redemption date."

20          Section 3.02 of each indenture states, "Applicability

21  of Article.   Redemption of Notes at the election of the Issuer

22  or otherwise, as permitted or required by any provision of this

23  Indenture, shall be made in accordance with such provision and

24  this Article."

25          Section 3.03 sets forth the procedure pursuant to

1    which the issuer, that is the debtors, "shall elect to redeem

2    Notes pursuant to the optional redemption provisions of

3    paragraph 5 of the applicable Note."

4            Section 3.06 of the indentures, entitled "Effect of

5    Notice of Redemption," states, "Once notice of redemption is

6    delivered in accordance with Section 3.05, Notes called for

7    redemption become due and payable on the redemption date and at

8    the redemption price stated in the notice, except as provided

9    in the final sentence of paragraph 5 of the Notes."

10           Section 3.09 of each indenture, in contrast to the

11   optional or elective redemption under sections 3.01 and 3.03 of

12   the indentures and paragraph 5 of the notes, provides for a

13   special mandatory redemption on the terms set forth in Section

14   3.09.

15           Paragraph 5 of the form of first and 1.5 lien notes

16   states, "Optional Redemption.  Except as set forth in the

17   following two paragraphs, the Notes shall not be redeemable at

18   the option of MPM prior to October 15, 2005.  Thereafter, the

19   Notes shall be redeemable at the option of MPM, in whole at any

20   time or in part from time to time" as provided therein.  And

21   then it states, "In addition, prior to October 15, 2015, the

22   Issuer may redeem the Notes at its option, in whole at any time

23   or in part from time to time, upon not less than 30 nor more

24   than 60 days' prior notice delivered electronically or mailed

25   by first-class mail to each holder's registered address, at a

1   redemption price equal to 100% of the principal amount of the

2   Notes redeemed plus the Applicable Premium as of, and accrued

3   and unpaid interest and Additional Interest, if any, to, the

4   applicable redemption date (subject to the right of the Holders

5   of record on the relevant record date to receive interest due

6   on the relevant interest payment date)."

7        "Applicable Premium" is separately defined in the

8   indentures as follows: "With respect to any Note on any

9   applicable redemption date, the greater of: (1) 1% of the then

10  outstanding principal amount of such Note and (2) the excess

11  of: (a) the present value at such redemption date of (i) the

12  redemption price of such Note, at October 15, 2015 (such

13  redemption price being set forth in paragraph 5 of the

14  applicable Note) plus (ii) all required interest payments due

15  on such Note through October 15, 2015 (excluding accrued but

16  unpaid interest), computed using a discount rate equal to the

17  Treasury Rate as of such redemption date plus 50 basis points;

18  over (b) the then outstanding principal amount of such Note."

19       The indenture trustees for the first and 1.5 lien

20  notes argue that the chapter 11 plan's payment of the holders

21  with replacement notes entitles them to the Applicable Premium,

22  as they will receive such notes before October 15, 2015.  They

23  contend that such payment would be an optional or elective

24  redemption under the provisions of the indentures and notes

25  that I have just read.

1           As I've noted and will discuss later, the trustees for

2    the first and 1.5 lien notes also argue that, even if they are

3    not entitled by contract to an Applicable Premium constituting

4    a make-whole under these circumstances, they nevertheless have

5    a claim under otherwise applicable law or the first sentence of

6    paragraph 5 of the notes, which they contend is a "non-call"

7    covenant, that is triggered by the debtors' early payment of

8    their notes in the form of replacement notes under the plan,

9    although the amount of such claim, or formula therefor, is not

10   set forth in the indentures or the notes.

11          Let me address the Applicable Premium argument first.

12   It is well established that when considering the allowance of a

13   claim in a bankruptcy case the court first considers whether

14   the claim would be valid under applicable nonbankruptcy law,

15   and then, second, if the claim is valid under applicable

16   nonbankruptcy law, whether there is any limitation on or

17   provision for disallowance of the claim under the Bankruptcy

18   Code.  See Ogle v. Fidelity & Deposit Company of Maryland, 586

19   F.3d 143, 147-48 (2d Cir. 2009); HSBC Bank U.S.A. v. Calpine

20   Corp., 2010 U.S. Dist. LEXIS 96792, at *18 (S.D.N.Y. Sept. 15,

21   2010).

22          It is well settled under New York law, which is,

23   again, the law governing these agreements, that the parties to

24   a loan agreement, indenture or note can amend the general rule

25   under New York law of "perfect tender" to provide for a

1   specific right on behalf of the borrower or issuer to prepay

2   the debt in return for agreed consideration that compensates

3   the lender for the cessation of the stream of interest payments

4   running to the original maturity date of the loan.  Without

5   that contractual option, under the New York rule of perfect

6   tender the borrower/issuer would be precluded from paying the

7   debt early.  See U.S. Bank National Association v. South Side

8   House LLC, 2012 Dist. LEXIS 10824, at *12-13 (E.D.N.Y. January

9   30, 2012), as well as Northwestern Mutual Life Insurance

10  Company v. Uniondale Realty Associates, 816 N.Y.S.2d 831, 835,

11  11 Misc. 3d 988, 984 (N.Y. Sup. Ct. 2006).  See generally

12  Charles & Kleinhaus, "Prepayment Clauses in Bankruptcy," 15 Am.

13  Bankr. Inst. L. Rev. 537, 541 (Winter 2007) ("Charles &

14  Kleinhaus"), and the cases cited therein at 541 n.13, applying

15  New York's perfect tender rule.

16          It is also well-settled law in New York that a lender

17  forfeits the right to such consideration for early payment if

18  the lender accelerates the balance of the loan.  The rationale

19  for this rule is logical and clear:  by accelerating the debt,

20  the lender advances the maturity of the loan and any subsequent

21  payment by definition cannot be a prepayment. In other words,

22  rather than being compensated under the contract for the

23  frustration of its desire to be paid interest over the life of

24  the loan, the lender has, by accelerating, instead chosen to be

25  paid early. See U.S. Bank National Association v. South Side

1   House, 2012 U.S. Dist. LEXIS 10824, at *13-14, and the cases

2   cited therein, including In re LHD Realty Corp., 726 F.2d 327,

3   331 (7th Cir. 1984); In re Solutia, Inc., 379 B.R. 473, 487-88

4   (Bankr. S.D.N.Y. 2007); In re Granite Broadcasting Corp., 369

5   B.R. 120, 144 (Bankr. S.D.N.Y. 2007); and Northwestern Mutual

6   Life Insurance Company v. Uniondale Realty Associates, 816

7   N.Y.S.2d at 836.

8           There are two well-recognized exceptions to that

9   proposition.  The first is agreed not to apply here, namely

10  when the debtor intentionally defaults in order to trigger

11  acceleration and evade the prepayment premium or make-whole,

12  the debtor will remain liable for the make-whole

13  notwithstanding acceleration of the debt.  See Sharon Steel

14  Corp. v. The Chase Manhattan Bank. N.A., 691 F.2d 1039, 1053

15  (2d Cir. 1982). Here, even if the trustees had not conceded

16  this point, it is clear that the debtors' bankruptcy is not

17  simply a tactical device to deprive the first and 1.5 lien

18  holders of a make-whole claim.

19          The second exception, which is at issue here, is when

20  a clear and unambiguous clause calls for the payment of a

21  prepayment premium or make-whole even in the event of

22  acceleration of, or the establishment of a new maturity date

23  for, the debt.  See, again, U.S. Bank National Association v.

24  South Side House, 2012 U.S. Dist. LEXIS 10824, at *14-16 and

25  *23; Northwestern Mutual Life Insurance Company v. Uniondale

1    Realty Associates, 816 N.Y.S.2d at 836, and the cases cited

2    therein.  Thus, the first and 1.5 lien holders' right to an

3    Applicable Premium, or make-whole, hinges on whether the

4    relevant sections of their indentures and notes provide with

5    sufficient clarity for the payment of such premium after the

6    maturity of the notes has been accelerated.

7            Critically important, therefore, is another provision

8    of the indentures, Section 6.02, which provides generally that

9    the trustee or the holders of at least 25 percent of principal

10   amount of the outstanding notes, upon an event of default, can

11   elect to accelerate the notes, but also states, "If an Event of

12   Default specified in Section 6.01(f) or (g) with respect to MPM

13   [which includes the debtors' bankruptcy] occurs, the principal

14   of, premium, if any, and interest on all the Notes shall ipso

15   facto become and be immediately due and payable without any

16   declaration or other act on the part of the Trustee or any

17   Holders."

18           The form of note attached to the indentures also

19   provides, in paragraph 15, "If an Event of Default relating to

20   certain events of bankruptcy, insolvency or reorganization of

21   the Issuer occurs, the principal of, premium, if any, and

22   interest on all the Notes shall become immediately due and

23   payable without any declaration or other act on the part of the

24   Trustee or any Holders."

25           (Section 6.02 in the indentures also provides, in its

1    final sentence, "The Holders of a majority in principal amount

2    of outstanding Notes by notice to the Trustee may rescind any

3    such acceleration with respect to the Notes and its

4    consequences," and the last sentence of paragraph 15 of the

5    notes states, "Under certain circumstances, the Holders of a

6    majority in principal amount of the outstanding Notes may

7    rescind any such acceleration with respect to the Notes and its

8    consequences."  The first and 1.5 lien trustees' arguments to

9    rescind acceleration of the notes are discussed in the third

10   section of this ruling)

11        In light of the automatic acceleration of the notes

12   under Section 6.02 of the Indentures, as also obliquely

13   referenced in paragraph 15 of the notes, upon the debtors'

14   bankruptcy filing, the debtors and the second lien holders

15   contend that the maturity date of the notes has been

16   contractually advanced and, thus, under New York law the first

17   and 1.5 lien holders, having provided for acceleration in the

18   applicable agreements, bargained for prepayment of the notes

19   upon the event of the debtors' bankruptcy and therefore

20   forfeited their right to the Applicable Premium.

21        (In addition, the debtors and the second lien holders

22   contend that the debtors' payment of the first and 1.5 lien

23   holders as required by the Bankruptcy Code before the original

24   maturity of the notes (or at least before October 15, 2015) is

25   not elective or voluntary, and, therefore, again, does not

1    subject the debtors to the Applicable Premium owed upon an

2    elective redemption under the express terms of Sections 3.02-

3    3.03 of the indentures and paragraph 5 of the notes.  The

4    debtors have the option under section 1124 of the Bankruptcy

5    Code, however, to reinstate the first and 1.5 lien notes rather

6    than pay them with substitute consideration, under a chapter 11

7    plan. In addition, the notice requirements of Bankruptcy Rule

8    2002 arguably functionally track the election/notice process

9    provided in sections 3.03 and 3.05 of the indentures.  Thus, I

10   have not further considered this argument of the debtors and

11   second lien holders in light of the efficacy of their first

12   argument.)

13        As noted previously, it is "well-settled law," South

14   Side House, 2012 U.S. Dist. LEXIS 10824, at *12, that, unless

15   the parties have clearly and specifically provided for payment

16   of a make-whole (in this case the Applicable Premium),

17   notwithstanding the acceleration or advancement of the original

18   maturity date of the notes, a make-whole will not be owed.

19   Such language is lacking in the relevant sections of the first

20   and 1.5 lien indentures and notes; therefore, they do not

21   create a claim for Applicable Premium following the automatic

22   acceleration of the debt pursuant to Section 6.02 of the

23   indentures. In addition to the cases that I have already cited

24   for this proposition, see In re Madison 92nd Street Associates,

25   LLC, 472 B.R. 189, 195-96 (Bankr. S.D.N.Y. 2012); In re

1   LaGuardia Associates LLP, 2012 Bankr. LEXIS 5612, at *11-13

2   (Bankr. E.D. Pa. Dec. 5, 2012); In re Premiere Entertainment

3   Biloxi, LLC, 445 B.R. 582, 627-28 (Bankr. S.D. Miss. 2010), and

4   the cases cited therein, all of which interpret New York law,

5   and some of which involve automatic acceleration clauses,

6   which, as noted by the district court in South Side House, have

7   the same negating effect as the voluntary exercise of an

8   acceleration right, given that such clauses were negotiated by

9   the parties. 2012 U.S. Dist. LEXIS 10824, at *20-23. See also

10   In re AMR Corporation, 730 F.3d at 101, in which the Second

11   Circuit made clear that such an automatic acceleration

12   provision operates by the choice of the indenture trustee as

13   much as the issuer/debtor; that is, such contractual automatic

14   acceleration is not voluntary on the issuer's part because it

15   is an enforceable covenant, including not being subject to

16   invalidation under any section of the Bankruptcy Code, such as

17   section 365(e), which would negate so-called ipso facto

18   provisions triggered by a debtor's bankruptcy filing.

19        The trustees for the first and 1.5 lien holders try

20   to get around the problem that their documents do not contain

21   sufficient language triggering an Applicable Premium after

22   acceleration in a couple of ways, one of which is to refer to a

23   discussion in In re Chemtura Corporation, 439 B.R. 561, 596-02

24   (Bankr. S.D.N.Y. 2010), in which Judge Gerber evaluated the

25   settlement of a make-whole dispute that was opposed by those

1    who contended that the beneficiaries of the settlement, who

2    were receiving a range of 39 and 43 percent of their make-whole

3    claim under it, should really recover nothing or at least far

4    less than that amount on account of such claims.

5          The trustees contend that Judge Gerber concluded that

6    a covenant triggering a make-whole amount upon a prepayment by

7    a date certain would be a specific enough of a reference to the

8    make-whole's being owed, notwithstanding the acceleration of

9    the debt, to satisfy the explicitness requirement in the cases

10   that I have previously cited.

11         I should note, however, that, in addition to the

12   settlement context in which Judge Gerber gave his analysis,

13   where he considered only whether the settlement lay within the

14   lowest bounds of reasonableness, he was focusing in Chemtura

15   not on a specific date like the pre-October 15, 2015 date set

16   forth in paragraph 5 of the notes here, but, rather, on a

17   provision that was triggered off a <u>differently defined maturity</u>

18   <u>date</u> than the original maturity date, thus keying liability for

19   the make-whole back to the need, as stated in the cases that I

20   have cited, to state clearly that the premium would be owed

21   notwithstanding the acceleration of the original maturity date.

22   Id. at 601

23         That is not the case under the notes and the

24   indentures here.  Indeed, in each of the reported cases that

25   quote language that would be explicit enough to overcome the

1    waiver of the make-whole upon acceleration under New York law,

2    more was required than is contained in the relevant sections of

3    the indentures and notes that I have quoted -- either an

4    explicit recognition that the make-whole would be payable

5    notwithstanding the acceleration of the loan or, as stated by

6    Charles & Kleinhaus, a provision that requires the borrower to

7    pay a make-whole whenever debt is repaid prior to its original

8    maturity, which is in essence what Judge Gerber was referring

9    to in the Chemtura case.  See Charles & Kleinhaus, 15 Am.

10   Bankr. Inst. L. Rev. at 556.  See also, for examples of the

11   type of specificity required to satisfy applicable New York

12   law, the discussion in U.S. Bank National Association v. South

13   Side House, LLC, 2012 U.S. Dist. LEXIS, 10824, at *21-24, and

14   In re LaGuardia Associates, L.P., 2012 Bankr. LEXIS 5612, at

15   *14-16.

16          That type of specificity works notwithstanding the

17   purpose of a make-whole, which is to ensure that the lender is

18   compensated for being paid earlier than the original maturity

19   of the loan for the interest it will not receive, because make-

20   wholes are properly viewed as an option pursuant to which the

21   parties have allocated the cost of prepayment between

22   themselves. South Side House, 2012 U.S. Dist. LEXIS 10824, at

23   *22-23; Northwestern Mutual Life Insurance Company v. Uniondale

24   Realty Associates, 816 N.Y.S.2d at 984; Charles & Kleinhaus, 15

25   Am. Bankr. Inst. L. Rev. at 566-67.  However, the option, as

1    noted, must be specific if the parties want it to apply even

2    after acceleration of the debt.

3          The trustees for the first and 1.5 lien notes also

4    contend that, even if they are not entitled to an Applicable

5    Premium, other provisions of the indentures refer to a lower

6    case "prepayment premium."  For example, as I noted, Section

7    3.02 of the indentures refers to the "Redemption of Notes at

8    the election of the Issuer or otherwise as permitted or

9    required by any provision of this Indenture shall be made in

10   accordance with such provision in this Article." (Emphasis

11   added.) (Although it should be noted that Section 3.09 of the

12   indentures provides for a mandatory redemption, which is what

13   the "or otherwise" reference in Section 3.02 apparently

14   addresses.) In addition, they point out that Section 6.02 of

15   the indentures provides for the automatic acceleration upon the

16   debtors' bankruptcy of "the principal of, premium, if any, and

17   interest on all the Notes" (emphasis added), and Section 6.03

18   states that "If an Event of Default occurs and is continuing,

19   subject to the terms of the New Intercreditor Agreement or the

20   Junior Priority Intercreditor Agreements, the Trustee may

21   pursue any available remedy at law or equity to collect the

22   payment of principal of or interest on the Notes or to enforce

23   the performance of any provision of the Notes, this Indenture

24   or the Security Documents" (that is, acknowledging the

25   trustees' common law enforcement rights, which, the trustees,

1   contend, would include the payment of a prepayment premium).

2          Each of these references to other rights or "premiums,

3   if any," to be paid upon prepayment are not specific enough,

4   however, to overcome the requirement of New York law that I

5   have previously outlined in order for a make-whole or

6   prepayment claim to be payable post-acceleration.

7          Moreover, the "if any" language that I've quoted

8   refers back to the actual provisions of the indentures and

9   notes, the only one of which that specifically provides for an

10  optional redemption and payment of a specific premium (the

11  Applicable Premium) does not sufficiently provide for payment

12  after acceleration under New York law, as previously discussed.

13  A similar provision appeared in the instrument at issue in In

14  re LaGuardia Associates, L.P., 2012 Bankr. LEXIS 5612, and

15  Judge Raslavich construed it much as I have here, stating, "On

16  the contrary, [such provision] references 'any payment required

17  to be paid under the note.' That returns the inquiry back to

18  Section 1.02(b) of the note and its description of the specific

19  two events which have not occurred." Id. at *19-20.  Similarly,

20  Section 3.02 of the indentures, which states, "Redemption of

21  Notes at the election of the Issuer or otherwise, as permitted

22  or required by any provision of this Indenture, shall be made

23  in accordance with such provision and this Article," does not

24  create a separate make-whole right enforceable upon

25  acceleration of the debt but only refers to rights that may be

1    triggered in accordance with the specific provisions of Article

2    3.

3          It is also the case that Section 3.06 of the

4    indentures, which states that "Once notice of redemption is

5    delivered in accordance with Section 3.05, Notes called for

6    redemption become due and payable on the redemption date and at

7    the redemption price stated in the notice, except as provided

8    in the final sentence of paragraph 5 of the Notes," is

9    superseded by the automatic acceleration upon the issuer's

10   bankruptcy, provided for in Section 6.02.  That is, the

11   foregoing language from the Section 3.06 is not a substitute

12   for acceleration, which made the notes due and payable on the

13   bankruptcy petition date, or a clear enough statement that,

14   notwithstanding acceleration, the redemption date, that is, the

15   date upon which the issuer would call the notes for redemption,

16   would artificially jump ahead of the prior acceleration or

17   ignore the acceleration and entitle the holders to a make-whole

18   under New York law.

19         Therefore, the indentures and notes do not overcome or

20   satisfy the requirement under New York law that a make-whole be

21   payable specifically notwithstanding acceleration or payment

22   prior to the original maturity date under the terms of the

23   parties' agreements.  There is, therefore, no claim for

24   Applicable Premium or any other amount under the indentures and

25   notes for the first and 1.5 lien holders that would be

1    triggered by the lien holders' treatment under the debtors'

2    chapter 11 plan, or any other payment of their notes following

3    their automatic acceleration under Section 6.02 of the

4    indenture.

5            This leaves to be decided the first and 1.5 lien

6    holders' remaining claim based on payment, under the chapter 11

7    plan by new replacement notes, of the first and 1.5 notes prior

8    to their maturity that would arise, they contend, under New

9    York's common law rule of perfect tender or, as argued by the

10   trustees, under the first sentence of paragraph 5 of the notes.

11   That sentence, they contend, sets forth a "non-call" covenant

12   when it states, "Except as set forth in the following two

13   paragraphs [which reference payments of contractual make-whole

14   that I have just ruled are not here owing], the Note shall not

15   be redeemable at the option of MPM prior to October 15, 2015."

16           The debtors and the second lien holders argue that

17   this sentence is no more than an introduction or framing device

18   for the notes' elective redemption provisions in return for

19   payment of the Applicable Premium, which immediately follow the

20   "non-call" sentence, and is not a specific contractual non-call

21   provision. In support of this contention, they point out that

22   the make-whole right actually arises under Sections 3.01-3.03

23   of the indentures, which then reference paragraph 5 of the

24   notes, which states the right to a make-whole amount under

25   certain circumstances. They are right: the indentures and notes

1    do not contain a covenant stating the amount owing upon the

2    voluntary call of the notes with the exception of sections

3    3.01-3.03 and the definition of Applicable Premium.

4              This leaves the trustees with the argument that New

5    York's common law of perfect tender would apply even if their

6    agreements were silent regarding the consequences of such

7    prepayment.  That is, the trustees for the first and 1.5 lien

8    notes contend that the holders are entitled to a claim under

9    New York law for a prepayment premium based merely on the fact

10   of prepayment, which, they point out, would be preserved under

11   the general reservation of common law rights and remedies set

12   forth in Section 6.03 of the indentures.

13             As noted previously, New York law would, in fact,

14   provide for such a claim for breach of the rule of perfect

15   tender, at least one for specific performance.  However,

16   applying the two-step claim analysis required by Ogle v.

17   Fidelity & Deposit Company of Maryland, 586 F.3d at 147-48, the

18   trustees would not have an allowable claim for such damages

19   under the Bankruptcy Code, because this is one of the few

20   instances when specific provisions of the Bankruptcy Code

21   disallow such a claim -- section 506(b), as well as section

22   502(b)(2), which disallows claims for unmatured interest.

23             First, it is well recognized that, notwithstanding New

24   York's perfect tender rule, such right is not enforceable by

25   specific performance in a bankruptcy case, given the Bankruptcy

1    Code's non-contractual acceleration of debt for claim

2    determination purposes.  See, for example, HSBC Bank USA v.

3    Calpine Corp., 2010 U.S. Dist. LEXIS 96792, at *11-14, and

4    Charles & Kleinhaus, 15 Am. Bankr. Inst. L. Rev. at 563-64.

5          In addition, as noted, no provision of the indentures

6    and notes (except as already found to be inapplicable in light

7    of the acceleration of the debt) provides for an additional

8    premium to be paid upon the prepayment of the notes. Thus, the

9    claim would not fall under the allowed claim provided to

10   oversecured creditors for fees and charges under the parties'

11   agreement under section 506(b) of the Bankruptcy Code up to the

12   value of their collateral. See HSBC Bank USA v. Calpine Corp.,

13   2010 U.S. Dist. LEXIS 96792, at *14-21; In re Solutia Inc., 379

14   B.R. at 485; In re Calpine Corp., 365 B.R. 392 (Bankr. S.D.N.Y.

15   2007), rev'd on other grounds, 2011 U.S. Dist. LEXIS 62100

16   (S.D.N.Y. June 7, 2011); and In re Vest Assocs., 217 B.R. 696,

17   699 (Bankr. S.D.N.Y. 1998).

18         It is not clear whether a claim for breach of a

19   contractual make-whole provision should be viewed as a claim

20   for unmatured interest (compare In re Trico Marine Services,

21   Inc., 450 B.R. 474, 480-81 (Bankr. D. Del. 2013) (recognizing

22   split of authority but holding that claim for breach of

23   contractual make-whole is liquidated damages for breach of an

24   option to prepay, not for unmatured interest), and In re

25   Doctors Hospital of Hyde Park, Inc., 508 B.R. 596, 605-06

1    (Bankr. N.D. Ill. 2014) (claim for breach of contractual yield

2    maintenance premium is for unmatured interest not paid as a

3    result of prepayment). However, the measure of a claim based on

4    New York's rule of perfect tender or a non-call right that does

5    not provide for liquidated damages would be the difference

6    between the present value of the interest to be paid under the

7    first and 1.5 lien notes through their stated maturity and the

8    present value of such interest under the replacement notes to

9    be provided to the fist and 1.5 lien holders under the chapter

10   11 plan, which should equate to unmatured interest.  See

11   Charles & Kleinhaus, 15 Am. Bankr. Inst. L. Rev. at 541-42,

12   580-81.  Accordingly such a claim also would be disallowed as

13   unmatured interest under section 502(b)(2) of the Bankruptcy

14   Code.  It is not interest that has accrued during the

15   bankruptcy case, but would, rather, accrue in the future, at

16   least to 2015 if not to 2020, the original maturity date of the

17   notes, and, therefore, would not be an allowed claim under

18   section 502(b)(2). HSBC Bank USA v. Calpine Corp., 2010 U.S.

19   Dist. LEXIS, at *14-21.

20        The two cases relied upon by the first and the 1.5

21   lien trustees for the contrary proposition actually are

22   consistent with the foregoing analysis.  The debtors in both

23   cases (unlike here) were solvent and, therefore, the courts

24   found them to be subject to an exception to section 502(b)(2)

25   of the Code's disallowance of claims for unmatured interest

1    under either equitable principles, as set forth in the

2    legislative history to section 1124 of the Bankruptcy Code (see

3    140 Cong. Rec. H 10,768 (October 4, 1994)), or because of the

4    application of the best interests test in section 1129(a)(7) of

5    the Code when the debtor is solvent.  See In re Premier

6    Entertainment Biloxi, LLC, 445 B.R. at 636-37; In re Chemtura

7    Corp., 439 B.R. at 636-37.

8         This analysis applies also to any claim premised on

9    the debtors' breach of the provision in the last sentence

10   Section 6.02 of the indentures, obliquely referenced in

11   paragraph 15 of the notes, that the issuer would under certain

12   circumstances permit the rescission of automatic acceleration

13   under Section 6.02 upon the issuer's bankruptcy.  The damages

14   for breach of such a rescission right, which are unspecified in

15   both the indentures and the notes, would equate to the same

16   lost unmatured interest that would apply to a breach of the

17   right of perfect tender or non-liquidated damages non-call

18   right.

19        Accordingly, I conclude both for purposes of

20   confirmation of the debtors' chapter 11 plan, as well as for

21   Adversary Proceeding Nos. 14-08227 and 14-08228, that the plain

22   language of the first and 1.5 lien indentures and notes as

23   applied to the present facts requires the allowed claim of the

24   indenture trustees for the first and 1.5 lien holders to

25   exclude any amount for Applicable Premium or any other damages

1    based on the early payment of the notes.

2         There is no relevant commentary or conduct by the

3    parties that would or should change that view, given that there

4    is no ability to consider parol evidence in light of the plain

5    meaning of the agreements under the contract interpretation

6    cases that I have already cited. I will note, however, that the

7    trustees for the first and 1.5 lien holders have contended that

8    the disclosure in the prospectuses for their notes, while

9    lengthy, fails to highlight the risk that, upon bankruptcy and

10   the automatic acceleration of the notes, no make-whole claim or

11   other damages would be owed upon the early payment of the

12   notes.

13        It is true that there is no such disclosure. I note,

14   however, that the vast majority of risk disclosures in the

15   prospectuses, 54 risk factors, pertains to fact-based risks --

16   either market or business or product risks.  Of the risk

17   factors disclosed, only six are bankruptcy-related, and they do

18   not specifically disclose material risks affecting the notes in

19   the issuer's bankruptcy in addition to the risk to the make-

20   whole claim.  Two disclosed bankruptcy-related risks pertain to

21   the potential avoidance of the notes or the liens under chapter

22   5 of the Bankruptcy Code.  Others state that the ability of

23   holders to realize upon their collateral and claims is subject

24   to certain bankruptcy law limitations (which may, in fact,

25   include, in broad scope, the risk that the first and 1.5 lien

1   holders may not have an allowed claim based on prepayment of

2   the notes in a bankruptcy case, although perhaps such

3   disclosure could simply be taken as a reference to the

4   imposition of the automatic stay under section 362(a) of the

5   Bankruptcy Code). But, as noted, there are other specific

6   bankruptcy risks in addition to risks to the allowance of a

7   make-whole claim that are not disclosed, including the risk of

8   being crammed down with notes payable over time, as opposed to

9   being paid in cash or reinstated, under section 1129(b)(2) of

10  the Bankruptcy Code.

11         Moreover, as observed by the Court in South Side

12  House, 2012 U.S. Dist. LEXIS 10824, at *12, the law that I have

13  applied to the first and 1.5 lien holders' make-whole claim is

14  "well-settled" and long established.  It has been stated

15  readily and cogently by courts that do not specialize in New

16  York law; i.e., courts from the Seventh, Third, and Fifth

17  Circuits, the latter two from Pennsylvania and Mississippi, as

18  well as Delaware. Thus it does not appear, to the extent that

19  one would even give any weight to the disclosure, or lack

20  thereof, in the prospectuses, that the noteholders needed to be

21  specially alerted to the risk that their make-whole claims

22  might be disallowed in bankruptcy based on the automatic

23  contractual acceleration of their notes, beyond the disclosure

24  that the issuer's bankruptcy might alter the noteholders'

25  rights.

1

2          Relatedly, as I've noted, the first and 1.5 lien

3    trustees have sought freedom from the automatic stay under

4    section 362(a) of the Bankruptcy Code to implement the

5    rescission of the automatic acceleration of the notes that

6    occurred under Section 6.02 of the indentures upon the debtors'

7    bankruptcy filing.  The mechanism for such rescission is also

8    set forth in Section 6.02 of the indentures and is loosely

9    referenced in paragraph 15 of the notes, which states, "Under

10   certain circumstances, the Holders of a majority in principal

11   amount of the outstanding Notes may rescind any such

12   acceleration with respect to the Notes and its consequences."

13         The first and 1.5 lien holders want to rescind the

14   contractual acceleration under Section 6.02 to avoid the fatal

15   effect of such acceleration upon their make-while rights in

16   light of their agreements' lack of the specificity required to

17   trigger the Applicable Premium upon acceleration under New York

18   law.

19         The trustees make three arguments to support their

20   request.  First, they state that the automatic stay does not

21   actually apply to sending a rescission notice.  Second, they

22   contend that, even if the automatic stay under section 362(a)

23   of the Code applies to such a notice, rescission is excepted

24   from the stay by section 555 of the Bankruptcy Code. Finally,

25   they contend that, even if the automatic stay applies, they

1    should be granted relief from the stay pursuant to section

2    362(d) of the Code.

3            I conclude that the automatic stay does, in fact,

4    apply to the sending of a rescission notice and contractual

5    deceleration of the debt.  Two provisions of the Bankruptcy

6    Code's automatic stay apply here.  First, section 362(a)(3) of

7    the Code states that the automatic stay upon the filing of the

8    case includes a stay of "any act to obtain possession of

9    property of the estate or property from the estate or to

10   exercise control over property of the estate."  Section

11   362(a)(6) then states that the following also are stayed: "any

12   act to collect, assess or recover a claim against the debtor

13   that arose before the commencement of the case under this

14   title."

15           In essence, as I've said, the first and 1.5 lien

16   trustees seek through a rescission notice to exercise a right

17   under the indentures, which, as contracts to which the debtors

18   are a party, are property of the debtors' estates.  The purpose

19   of sending a rescission notice would be to enable the holders

20   to recover a sizeable claim against the debtors -- that is, to

21   resurrect their make-whole claim, which has been loosely

22   quantified as approximating $200 million -- through

23   deceleration of the debt.  They thus seek to control property

24   of the estate by exercising a contract right to the estate's

25   detriment and recover, by decelerating, a claim against the

1    debtors.

2         The Second Circuit has recently held in a very similar

3    context that sending such a notice would, in fact, be subject

4    to the automatic stay of section 362(a).  In re AMR Corp., 730

5    F.3d at 102-03 and 111-12, citing In re 48th Street Steakhouse,

6    Inc., 835 F.3d, 427 (2d Cir. 1987), and In re Enron Corp., 300

7    B.R. 201 (Bankr. S.D.N.Y. 2013), in which contract rights were

8    found to be property of the debtor and actions that had the

9    effect of terminating, or would, in fact, terminate or alter,

10   those rights, even if taken against a third party, as in 48th

11   Street Steakhouse, would therefore constitute the exercise of

12   control over property of the estate stayed by section

13   362(a)(3).  See also In re Solutia Inc., 379 B.R. at 484-85.

14        Additionally, here, as in AMR and Solutia, the purpose

15   of sending such a notice would be to recover a claim against

16   the debtors, because the first and most important step in

17   recovering a make-whole claim would be to resurrect the right

18   to the Applicable Premium by decelerating the debt.  Therefore,

19   it is clear that the automatic stay under section 362(a)(6) of

20   the Code also applies.

21        The trustees have argued that a rescission notice

22   would not alter what the debtors would retain under the plan,

23   and, therefore, that section 362(a)(3) should not apply,

24   because this is fundamentally, or economically, an

25   intercreditor dispute; i.e., the value -- the $200 million --

1    that the first and 1.5 lien holders seek to include as part of

2    their claim if rescission and deceleration is permitted, would

3    otherwise effectively be distributed to the second lien holders

4    and the trade creditors under the plan.

5           However, that is not a proper reading of section

6    362(a) of the Bankruptcy Code.  As noted by the court in In re

7    Strata Title, LLC, 2013 Bankr. LEXIS 1704 at *17-18 (Bankr. D

8    Az. Apr. 25, 2013), such a reading of section 362(a)(3) would

9    add a phrase to the statute that is not present, namely "unless

10   such act would provide economic value to the estate."

11   Moreover, it ignores the applicability of section 362(a)(6).

12          This is also clearly not a case, as the trustees

13   contended at oral argument, where the automatic stay wouldn't

14   apply because the transaction is only between third parties, in

15   the nature of a letter of credit draw which is not subject to

16   the automatic stay because the issuer has a separate and

17   independent obligation to the beneficiary the payment of which

18   does not control the debtor's property; rather, the effect on

19   the debtors' estates of the requested rescission and

20   deceleration would be direct -- controlling and increasing the

21   first and 1.5 lien holders' recovery of property of the estate.

22          Similarly, Second Circuit cases cited by the trustees

23   for the proposition that, "[t]he general policy behind section

24   362(a) is to grant complete immediate, albeit temporary, relief

25   to the debtor from creditors and also to prevent dissipation of

1   the debtor's assets before any distribution to creditors can be

2   effective," SEC v. Brennan, 230 F.3d 65, 70 (2d Cir. 2000), are

3   taken entirely out of context, whereas the trustees ignore

4   numerous cases, discussed below, in which the courts have

5   prohibited, as did the Second Circuit in AMR, actions that

6   would permanently alter, postpetition, the rights of creditors

7   that existed on the petition date, such as by sending notices

8   like the rescission notice at issue here.

9        It is clear that there is a difference between

10  automatic acceleration pursuant to a contract, as is the case

11  here, and acceleration generally as a matter of bankruptcy law

12  upon the commencement of a bankruptcy case for the purpose of

13  determining claims against the estate, as I'll discuss in more

14  detail when I consider whether relief should be granted from

15  the stay pursuant to section 362(d) of the Code.  For present

16  purposes, however, it is sufficient to note that here a

17  contract to which the debtors are a party would specifically be

18  affected for the purpose of recovering on a claim against the

19  debtors, and, therefore, the automatic stay under section

20  362(a) of the Bankruptcy Code applies.

21       In addition, the indenture trustees make an argument

22  that was not raised in AMR or Solutia: that the sending of a

23  rescission notice to decelerate the first and 1.5 lien notes

24  would merely be liquidating a securities contract, which is

25  permissible under section 555 of the Bankruptcy Code

1    notwithstanding the automatic stay under section 362(a).

2         Section 555 of the Bankruptcy Code provides, "The

3    exercise of a contractual right of a stockbroker, financial

4    institution, financial participant or securities clearing

5    agency to cause the liquidation, termination or acceleration of

6    a securities contract as defined in section 741 of this title,

7    because of a condition of the kind specified in section 365(e)

8    of this title [i.e., so called "ipso facto" conditions such as

9    the commencement of the bankruptcy case], shall not be stayed,

10   avoided or otherwise limited by operation of any provision of

11   this title."

12        The first and 1.5 lien trustees contend that the

13   effect of the rescission notice would be to fix and, therefore,

14   liquidate, the amount of their claims in the bankruptcy case

15   and, therefore, that it would, pursuant to section 555 of the

16   Code, not be subject to the automatic stay. There are several

17   problems with this argument, however.

18        First, I have serious doubts that the indenture itself

19   is a securities contract as defined in section 741(7)(A) of the

20   Bankruptcy Code, at least with respect to this issue.

21   Generally speaking, section 741(7) of the Code's definition of

22   "securities contract," which is lengthy, states that it is a

23   contract for the purchase, sale or loan of a security.

24   Clearly, the indentures themselves are not contracts for the

25   purchase, sale or loan of a security; they instead set forth

1    the terms under which the underlying notes will be governed and

2    the role of the trustees in connection therewith.  See In re

3    Qimonda Richmond, LLC, 467 B.R. 318, 323 (Bankr. D. Del. 2012),

4    holding, albeit without much discussion, that an indenture does

5    not fall within the definition of section 741(7)(A).

6         The trustees rely on subsection (A)(x) of section

7    741(7) of the Code to fit the indentures within the "securities

8    contract" definition notwithstanding that the indentures

9    themselves are not contracts for the purchase, sale or loan of

10   a security.  Section 741(7)(A)(x) states, in relevant part, "A

11   'securities contract' means . . . (x) a master agreement that

12   provides for an agreement or transaction referred to in [among

13   other sub-clauses] clause (i) [that is, a contract for the

14   purchase, sale, or loan of a security, among other

15   transactions], without regard to whether the master agreement

16   provides for an agreement or transaction that is not a

17   securities contract under this subparagraph, except that such

18   master agreement shall be considered to be a securities

19   contract under this subparagraph only with respect to each

20   agreement or transaction under such master agreement that is

21   referred to in clause (i) [i.e., a contract for the purchase,

22   sale or loan of a security]."

23        It is far from clear that the indentures would be

24   viewed as such a master agreement, however, given the proviso

25   in the last clause of subsection 741(A)(x), with respect to the

1   indentures' rescission section, which does not itself pertain

2   to the purchase, sale or loan of the notes and, further,

3   because paragraph 15 of the notes does not specify any

4   rescission right but instead refers to a right that is

5   exercisable under unidentified provisions upon certain

6   unspecified circumstances.

7          Relatedly, and even more significantly, I do not

8   believe that sending the rescission notice, the consequences of

9   which, as I have stated, would enable the deceleration of the

10  notes to permit the increase of a claim against the debtors in

11  the amount of the make-wholes, is in fact covered by section

12  555 of the Bankruptcy Code, because it is not a "liquidation"

13  as contemplated by that section.

14         The customary interpretation of section 555 is that it

15  "provides a tool for the non-defaulting. . .participant to

16  exercise its contractual right to close-out, terminate or

17  accelerate a 'securities contract.' Such a close-out or

18  liquidation typically entails termination or cancellation of

19  the contract, fixing of the damages suffered by the

20  nondefaulting party based on market conditions at the time of

21  liquidation, and accelerating the required payment date of the

22  net amount of the remaining obligations and damages." In re

23  American Home Mortgage, Inc., 379 B.R. 503, 513 (Bankr. D. Del

24  2008), quoting 5 Collier on Bankruptcy, paragraph 555.04 (16th

25  ed. 2014)).

1            Here, to the contrary, the first and 1.5 lien trustees

2    look to decelerate and create a different claim than existed on

3    the bankruptcy petition date.  As discussed by Judge Peck in

4    decisions in the Lehman Brothers case pertaining to a closely

5    analogues provision of the Bankruptcy Code, section 560, that

6    type of action does not fall within section 555 of the

7    Bankruptcy Code, which, with its companion sections, is a

8    narrow provision that should not be used to improve a contract

9    party's standing or claim in the bankruptcy case.  See Lehman

10   Brothers Special Fin. Inc. v. Ballyrock AGS CDO 2007-1 Ltd.,

11   452 B.R. 31, 40 (Bankr. S.D.N.Y. 2011), in which Judge Peck

12   held that, rather than exercising a right subject to the safe

13   harbor of section 560 of the Code, the parties were

14   impermissibly seeking to improve their positions. See also In

15   re Lehman Brothers Holdings, Inc., 502 B.R. 383, 386 (Bankr.

16   S.D.N.Y. 2013), discussing Ballyrock and Lehman Brothers

17   Special Fin. Inc. v. BNY Corporate Trading Services Ltd., 422

18   B.R. 407, 421 (Bankr. S.D.N.Y. 2010).

19           Moreover, the rescission right sought to be exercised

20   here is not a right automatically arising upon the commencement

21   of the debtors' bankruptcy case and, thus, covered by section

22   365(e) of the Bankruptcy Code as referenced in section 555. As

23   noted, the trustees instead seek to decelerate debt that was

24   automatically accelerated under Section 6.02 of the indentures

25   upon the bankruptcy filing.  Thus, the exercise of the

1  rescission right does not fall within the plain language of

2  section 555 of the Code.

3       I have also concluded, in large measure based upon the

4  AMR case, that relief from the automatic stay should not be

5  granted here under section 362(d) of the Bankruptcy Code.  The

6  Second Circuit in AMR affirmed Judge Lane's determination in

7  the exercise of his discretion not to lift the automatic stay

8  to permit a similar notice to be sent. 730 F.3d at 111-12.

9       The trustees argue for stay relief under both sections

10  362(d)(1) and (d)(2) of the Code.  I conclude that subsection

11  (d)(2) is not applicable here.  It provides for "relief from

12  the stay provided under subsection (a) of this section with

13  respect to a stay of an act against property under subsection

14  (a) of this section if (A) the debtor does not have an equity

15  in such property; and (B) such property is not necessary to an

16  effective reorganization."  Here, the debtors convincingly

17  argued that subsection 362(d)(2) was intended to address, and

18  does, by its terms, address, acts against property in which a

19  creditor has an interest, such as a lien interest, as opposed

20  to a right against a contract or to exercise a right under a

21  contract, such as under Section 6.02 of the indentures.  See In

22  re Motors Liquidation Company, 2010 U.S. Dist. LEXIS 125182, at

23  *8-9 (S.D.N.Y. Nov. 17, 2010).

24       Moreover, under section 362(g) of the Code, the movant

25  has the burden to show that the debtor does not have an equity

1    in such property under section 362(d)(2)(A), and I believe that

2    it was conceded during oral argument, and, in any event, I so

3    find, that the first and 1.5 lien trustees have not sustained

4    that burden.  It is not clear to me how they possibly could

5    have shown that the debtors have no equity in the indentures,

6    given that, before a rescission the trustees' claims pursuant

7    to the indentures are worth far less, perhaps $200 million

8    less, than if the trustees obtain relief from the stay for

9    rescission.  That $200 million would establish, I believe, the

10   debtors' equity in light of the fact that the trustees do not

11   have a lien on or other prior interest in the indentures.

12          That leaves the trustee's request for relief under

13   section 362(d)(1) of the Bankruptcy Code, which provides for

14   relief from the automatic stay "for cause, including a lack of

15   adequate protection of an interest in property of such party-

16   in-interest."  As noted, we are not dealing with a lien or

17   other prior interest in property held by the indenture

18   trustees; we are dealing with their desire to exercise a

19   contract right, rescission.  Therefore, the Second Circuit's

20   Sonnax case, which applies generally where relief from the stay

21   is sought for purposes other than to enforce an interest in

22   property, controls.  In re Sonnax Industries, 907 F.2d 1280,

23   1285-86 (2d Cir. 1990) (setting forth factors that may be

24   relevant to a determination on a request to lift the automatic

25   stay in such circumstances); see also In re Bogdanovich, 292

1   F.3d 104, 110 (2d Cir. 2002).   AMR applied the Sonnax factors

2   in this context. 730 F.3d at 111-12.

3         As I noted earlier, the sending of a rescission, or

4   deceleration notice significantly impacts the debtors' estate

5   and creditors -- in this case by enhancing claims potentially

6   by hundreds of millions of dollars.   It is, therefore, the type

7   of action that courts have routinely refused to permit under

8   section 362(d)(1) of the Bankruptcy Code.   As noted by Judge

9   Beatty in In re Solutia, 379 B.R. at 488, a contractual

10  acceleration provision goes well beyond the acceleration that

11  occurs as a matter of bankruptcy law with respect to the

12  determination of claims against the estate.   One can, as

13  discussed in In re Solutia; In re Manville Forests Products

14  Corp., 43 B.R. 293, 297-98 (Bankr. S.D.N.Y.) and HSBC Bank USA

15  v. Calpine Corp., 2010 U.S. Dist. LEXIS 96792, at *10-11,

16  observe that as a matter of law the filing of the bankruptcy

17  case itself accelerates debt.   However, a contractual

18  acceleration provision advances the maturity date of the debt

19  in ways that have consequences in the bankruptcy case beyond

20  the operation of this general bankruptcy law principle.   For

21  example, such acceleration may give rise to a right to damages

22  under section 1124(2)(C) of the Bankruptcy Code if the debtor

23  later attempts to decelerate and reinstate the debt.   It also

24  may give the creditor a right to a different type or amount of

25  interest; and the presence or absence of such a provision may

1    also affect rights against other parties including co-debtors.

2    See, e.g., In re Texaco, Inc., 73 B.R. 960 (Bankr. S.D.N.Y.

3    1987).  In that case, because there was no automatic

4    contractual acceleration provision, noteholders sought to send

5    an acceleration notice that would give them the right to an

6    increased interest rate under their agreement. The court

7    declined to lift the automatic stay. Id. at 968, stating that

8    the noteholders sought more than simply to preserve the

9    prepetition status quo. See also In re Metro Square, 1988

10   Bankr. LEXIS 2864, at *7-9 (Bankr. D. Minn., August 10, 1988).

11   And, as noted, by Judge Lifland in In re Manville Forest

12   Products, 43 B.R. at 298 n.5, "While the Court today holds that

13   sending a notice of acceleration is unnecessary to file a claim

14   against a debtor for the entire amount of the debt, despite the

15   actual maturity date or the terms of the contract, this does

16   not apply where notice is required as a condition precedent to

17   establish other substantive contractual rights such as the

18   right to receive a post-default interest rate.  In that case,

19   the sending of such notice would be ineffective under the

20   automatic stay provisions of the Code if done without the

21   provision of the bankruptcy court."  Of course, Judge Lane

22   performed a similar analysis in denying the trustee's request

23   for stay relief in In re AMR Corp., 485 B.R. 279, 295-96

24   (Bankr. S.D.N.Y. 2013), aff'd 730 F.2d at 111-12.

25           Thus, the first and 1.5 lien trustees' request for

1    stay relief should not be granted to permit such a material

2    change to be effectuated.  Key "Sonnax factors" regarding the

3    impact of rescission and deceleration on the parties and on the

4    case strongly argue against granting such relief.  Therefore,

5    in the exercise of my discretion under section 362(d)(1) of the

6    Code, I conclude that the automatic stay should not be lifted

7    to enable the resurrection of a make-whole claim by means of

8    the rescission of the automatic acceleration provided for in

9    Section 6.02 of the indentures.

10

11        As previously noted, the holders of the first and 1.5

12    lien notes have voted as classes to reject confirmation of the

13    debtors' chapter 11 plan.  The plan otherwise meets, as I've

14    stated, the confirmation requirements of section 1129(a) of the

15    Bankruptcy Code.  But, to be confirmed over the objection of

16    the objecting classes comprising the first and 1.5 lien

17    holders, the plan must also satisfy the "cram down"

18    requirements of section 1129(b) of the Bankruptcy Code.  At

19    issue is whether section 1129(b)(2) of the Code has been

20    satisfied, there being no objection to the cramdown

21    requirements pertaining to secured creditors set forth in

22    section 1129(b)(1) with the exception of its requirement that

23    the a plan be "fair and equitable," which term is defined in

24    section 1129(b)(2).

25        Section 1129(b)(2) of the Bankruptcy Code states, "For

1   the purpose of this subsection, the condition that a plan be

2   fair and equitable with respect to a class includes the

3   following requirements:  (A) With respect to a class of secured

4   claims, the plan provides -- (i)(I) that the holders of such

5   claims retain the liens securing such claims, whether the

6   property subject to such liens is retained by the debtor or

7   transferred to another entity, to the extent of the allowed

8   amount of such claims; and (II) that each holder of a claim of

9   such class receive on account of such claim deferred cash

10  payments totaling at least the allowed amount of such claim, of

11  a value, as of the effective date of the plan, of at least the

12  value of such holder's interest in the estate's interest in

13  such property."  Section 1129(b)(2)(A)(ii) and (iii) set forth

14  two other ways under which a plan can be "fair and equitable"

15  to a dissenting secured class, but neither is applicable here,

16  the debtors relying, instead, on section 1129(b)(2)(A)(i).

17       The only issue as to whether the debtors' chapter 11

18  plan satisfies section 1129(b)(2)(A)(i) of the Code is whether

19  the plan provides, as set forth in sub-clause (A)(i)(II), that

20  the holders of the first and 1.5 lien notes will "receive on

21  account of such claim deferred cash payments totaling the

22  allowed amount of such claim, of a value, as of the effective

23  date of the plan, of at least the value of such holder's

24  interest in the estate's interest in such property."  (Sub-

25  clause (A)(i)(I) is satisfied because under the plan the first

1    and 1.5 lien holders shall retain the liens securing their

2    claims to the extent of their allowed secured claims.  Their

3    liens are not being diminished under the plan, and, as I have

4    previously found, those liens will secure the allowed amount of

5    their claims.)

6         Whether the plan satisfies section

7    1129(b)(2)(A)(i)(II) of the Code depends on the proper present

8    value interest rate under the replacement notes to be issued to

9    the first and 1.5 lien holders under the plan on account of

10   their allowed claims, given that those notes will satisfy their

11   claims over seven and seven-and-a-half years, respectively.

12   The debtors contend that the interest rates under the

13   replacement notes are sufficient on a present value basis to

14   meet the test of section 1129(b)(2)(A)(i)(II).

15        The interest rate on the new replacement first lien

16   notes that are proposed to be issued under the plan is the

17   seven-year Treasury note rate plus 1.5 percent.  As of August

18   26, 2014, the date of my bench ruling, that would equal an

19   approximately 3.60 percent interest rate, based on public data

20   issued for such Treasury notes.  The proposed replacement notes

21   for the 1.5 lien holders would have an interest rate equal to

22   an imputed seven-and-a-half-year Treasury note (based on the

23   weighted averaging of the rates for seven-year and ten-year

24   Treasury notes) plus 2 percent, which as of August 26, 2014 I

25   calculated as approximately 4.09 percent based on public data

1    for such Treasury notes.

2         The indenture trustees for the first and the 1.5 lien

3    holders contend that those rates do not satisfy the present

4    value test in section 1129(b)(2)(A)(i)(II) of the Code and

5    argue for higher interest rates under the replacement notes

6    based on their view of what market-based lenders would expect

7    for new notes if the same tenor issued by comparable borrowers.

8         The Court clearly is not writing on a blank slate on

9    this issue.  It is largely governed by the principles

10   enunciated by the plurality opinion in Till v. SCS Credit

11   Corp., 541 U.S. 465 (2004), and, to the extent that the Court

12   has any concerns based on Till being a plurality opinion, In re

13   Valenti, 105 F.3d 55 (2d Cir. 1997).

14        Both of those cases analyzed and applied a closely

15   analogous provision in chapter 13 of the Bankruptcy Code,

16   section 1325(a)(5)(B)(i)(II), which states that, among other

17   things required to confirm a plan with respect to an allowed

18   secured claim, the plan must provide that, "the value, as of

19   the effective date of the plan, of property to be distributed

20   under the plan on account of such claim is not less than the

21   allowed amount of such claim."  As noted by the Court in Till,

22   this provision is not only closely analogous to other

23   provisions of the Bankruptcy Code (including section

24   1129(b)(2)(A)(i)(II) that I have just quoted), but also

25   "Congress likely intended bankruptcy judges and trustees to

1    follow essentially the same approach when choosing an

2    appropriate interest rate under any of the many Code provisions

3    requiring a court to discount a stream of deferred payments

4    back to their present dollar value." 541 U.S. at 474.

5    Valenti, which was cited favorably in Till and which applies

6    generally the same approach as Till to the proper present value

7    interest rate for chapter 13 plan purposes, has also been

8    construed as applying in a chapter 11 context to the cramdown

9    of a secured creditor under section 1129(b)(2)(A)(i)(II). In re

10   Marfin Ready Mix Corp., 220 B.R. 148, 158 (Bankr. E.D.N.Y.

11   1998).  As discussed later, there is no sufficiently contrary

12   basis to distinguish the chapter 13 and chapter 11 plan

13   contexts in light of the similarity of the language of the two

14   provisions and the underlying present value concept that Till

15   recognized should be applied uniformly throughout the Code.

16        Till and Valenti establish key first principles that I

17   should follow, therefore, when considering the proper interest

18   rate to present value a secured creditor's deferred

19   distributions under a plan for cramdown purposes.  Both cases

20   quite clearly rejected alternatives that were proposed, and

21   have been proposed now by the first and 1.5 lien trustees, that

22   require a market-based analysis or inquiry into interest rates

23   for similar loans in the marketplace.  That is, both cases

24   rejected the so-called "forced loan" or "coerced loan"

25   approach, which Valenti defined as adopting the "interest rate

1   on the rate that the creditor charges for loans of similar

2   character, amount, and duration to debtors in the same

3   geographic region." 105 F.3d at 63.  See Till, 541 U.S. at 477,

4   where the Court rejected market-based methodologies in favor of

5   the so-called "formula approach":

6        [We] reject the coerced loan, presumptive contract

7        rate, and cost of funds approaches.  Each of these

8        approaches is complicated, imposes significant

9        evidentiary costs, and aims to make each individual

10       creditor whole rather than to ensure the debtor's

11       payments have the required present value.  For example,

12       the coerced loan approach requires bankruptcy courts to

13       consider evidence about the market for comparable loans

14       to similar (though nonbankrupt) debtors -- an inquiry

15       far removed from such courts' usual task of evaluating

16       debtors' financial circumstances and the feasibility of

17       their debt adjustment plans.  In addition, the approach

18       overcompensates creditors because the market lending

19       rate must be high enough to cover factors, like

20       lenders' transaction costs and overall profits, that

21       are no longer relevant in the context of court-

22       administered and court-supervised cramdown loans.

23   541 U.S. at 477.  See also In re Valenti, 105 f.3d at 63-4,

24   (rejecting forced loan approach in favor of a formula

25   approach). Of course the so-called "presumptive contract rate,"

1   that Till rejected was also a market-based test based on the

2   parties' prepetition interest rate as adjusted for current

3   market factors, as, in lesser degree, was the "cost of funds"

4   approach that Till also rejected, which was based on the

5   creditor's cost of capital, again tracking a market, although,

6   in that case, with the emphasis on the creditor's

7   characteristics rather than the debtor's.

8        Both courts stated similar reasons for rejecting

9   market-based approaches in setting a cramdown rate.  As stated

10  in Valenti, "the 'forced loan' approach misapprehends the

11  'present value' function of the interest rate.  The objective

12  of Section 1325(a)(5)(B)(ii) is to put the creditor in the same

13  economic position it would have been in had it received the

14  value of its allowed claim immediately.  The purpose is _not_ to

15  put the creditor in the same position that it would have been

16  in had it arranged a 'new' loan." (Emphasis in the original).

17  105 F.3d at 63-4.  "Moreover, as our analysis in the preceding

18  section illustrates, the value of a creditor's allowed claim

19  does not include any degree of profit.  There is no reason,

20  therefore, that the interest rate should account for profit."

21  Id. at 64.  Similarly, Till distinguished the cramdown rate

22  from market loans; the former does not require the lender to be

23  indifferent compared to the result in a foreclosure, where the

24  creditor could then re-lend the proceeds in the marketplace,

25  541 U.S. at 476 , and should not "overcompensate[] creditors

1   because the market lending rate must be high enough to cover

2   factors, like lenders' transaction costs and overall profits,

3   that are no longer relevant in the context of court-

4   administered and court-supervised cramdown loans." Id. 541 U.S.

5   at 477-78.

6          The cramdown rate analysis, therefore, should focus on

7   a rate that does not take market factors into account but,

8   rather, starts with the riskless rate applicable to all

9   obligations to be paid over time, adjusted for the risks unique

10  to the debtor in actually completing such payment.  Id. 541

11  U.S. at 474-80.  It should thus be a relatively simple, uniform

12  approach consistent with bankruptcy "courts' usual task of

13  evaluating the feasibility of their debt adjustment plans" not

14  on costly and expensive evidentiary hearings to discern

15  marketplace data. Id. 541 U.S. at 477; see also In re Valenti,

16  105 F.3d at 64.

17         As noted, in light of the foregoing considerations the

18  Supreme Court adopted, as did the Second Circuit in Valenti

19  before it, a formula approach, which is also the approach

20  adopted by the debtors (in contrast to the trustees for the

21  first and 1.5 lien holders, who have utilized a market-based

22  approach) with respect to the replacement notes to be issued

23  under the plan. Under the formula approach, the proper rate for

24  secured lenders' cramdown notes begins with a risk-free base

25  rate, such as the prime rate used in Till, or the Treasury rate

1    used in Valenti, which is then adjusted by a percentage

2    reflecting a risk factor based on the circumstances of the

3    debtor's estate, the nature of the collateral security and the

4    terms of the cramdown note itself, and the duration and

5    feasibility of the plan.  Till, 541 U.S. at 479; Valenti, 104

6    F.3d at 64. Both Till and Valenti held that, generally

7    speaking, the foregoing risk adjustment should be between 1 and

8    3 percent above the risk-free base rate.  Id.

9            It is clear from those opinions that the formula

10   approach's risk adjustment is not a back door to applying a

11   market rate.  Indeed, the Supreme Court stated, "We note that

12   if the Court could somehow be certain a debtor would complete

13   his plan, the prime rate would be adequate to compensate any

14   secured creditors forced to accept cramdown loans." 541 U.S.

15   at 479 n.18.  That is, no adjustment whatsoever to the risk-

16   free rate would be required if the Court found that the debtors

17   were certain to perform their obligations under the replacement

18   notes.  The focus, therefore, should be generally on the risk

19   posed by the debtor within a specified band, as opposed to

20   market rates charged to comparable companies. Nothing could be

21   clearer than the two Courts' statements on that point.

22   Therefore, as a first principle, the cramdown interest rate,

23   under section 1129(b)(2)(A)(i)(II) of the Code, should not

24   contain any profit or cost element, which were rejected by Till

25   and the Second Circuit in Valenti as inconsistent with the

1    present-value approach for cramdown purposes.  In addition,

2    market-based evidence should not be considered, except,

3    arguably and, if so secondarily, when setting a proper risk

4    premium in the formula approach taken by Till and Valenti.

5         Notwithstanding this very clear guidance, some courts,

6    and the first and 1.5 lien trustees here, have argued that a

7    market rate test should nevertheless be followed in chapter 11

8    cases.  They have relied, as they must since there is no other

9    basis in Till or Valenti for the argument, entirely on footnote

10   14 in Till, which appears at 541 U.S. 476.

11        That footnote states, "This fact helps to explain why

12   there is no readily apparent Chapter 13 cramdown market rate of

13   interest.  Because every cramdown loan is imposed by a court

14   over the objection of a secured creditor, there is no free

15   market of willing cramdown lenders.  Interestingly, the same is

16   not true in the Chapter 11 context, as numerous lenders

17   advertise financing for Chapter 11 debtors-in-possession."

18   (Emphasis in the original.)

19        Till's footnote 14 then cites certain web site

20   addresses that advertise such financing, and continues, "Thus,

21   when picking a cramdown rate in a Chapter 11 case, it might

22   make sense to ask what rate an efficient market would produce.

23   In the Chapter 13 context, by contrast, the absence of any such

24   market obligates courts to look to first principles and ask

25   only what rate will fairly compensate a creditor for its

1    exposure."

2          I have the following reactions to that discussion.

3    First, as is clear from its introductory clause, Till's

4    footnote 14 is referring to a specific fact alluded to in the

5    sentence to which it is footnoted, which is that the cramdown

6    rate of interest does not "require that the creditors be made

7    subjectively indifferent between present foreclosure and future

8    payment," that is, between future payment under the plan and

9    how the creditor would put its money to use lending to similar

10   borrowers after a foreclosure in the marketplace.   Id.   And

11   then the Court says, "Indeed the very idea of a cramdown loan

12   precludes the latter result: By definition, a creditor forced

13   to accept such a loan would prefer instead to foreclose."

14   (Emphasis in the original.) Therefore, footnote 14's statement

15   that "this fact helps to explain why there is no readily

16   apparent Chapter 13 cramdown market rate of interest," is

17   referring to a willingness to lend to a debtor in bankruptcy

18   but does so in a context that very clearly rejects the lender's

19   right or to be rendered indifferent to cramdown or to be

20   compensated for cramdown purposes on a market basis.   More

21   specifically, footnote 14 refers to debtor-in-possession

22   financing, where third parties seek to lend money to a debtor

23   and the debtor seeks to borrow it, in contrast to opposing the

24   debtor's forced cramdown "loan."

25          (As an aside, I should note that Till has been

1    criticized for its understanding of debtor-in-possession, or

2    "DIP" loans, and I believe no case has suggested that a DIP

3    loan rate should be used as the rate for a cramdown present-

4    value calculation.  The criticism is found in 7 Collier on

5    Bankruptcy, paragraph 1129.05[c][i] (16th ed. 2014), where the

6    editors state, "The problem with this suggestion" -- i.e.,

7    footnote 14's reference to DIP loans -- "is that the relevant

8    market for involuntary loans in Chapter 11 may be just as

9    illusory as in Chapter 13.  The reason for this illusion is the

10   inapt and unstated inference the Court makes with respect to

11   the similarity between the interest rates applicable to debtor-

12   in-possession financing and the interest rates applicable to

13   loans imposed upon dissenting creditors at cramdown.  While

14   both types of financing can occur in a Chapter 11 case, that

15   may be the extent of their similarity.  Debtor-in-possession

16   financing occurs at the very beginning of the case, while the

17   determination of a cramdown rate, under Section 1129(b)(2),

18   occurs at confirmation.  Thus, instead of the interim and

19   inherently more uncertain risk present in debtor-in-possession

20   financing, the court, at confirmation, is presented with a less

21   risky, more stable and restructured debtor.  The fact that the

22   debtor is more stable is bound up in the court's necessary

23   feasibility determination under Section 1129(a)(11). In

24   addition, common risk factors, such as the loan's term and the

25   level of court supervision, differ greatly between the two

1    types of financing.  There are many more differences, but they

2    can be summed up as follows:  loans imposed at confirmation

3    resemble more traditional exit or long-term financing than

4    interim debtor-in-possession financing.")

5         Thus it was not general financing in the marketplace

6    that Till was focusing on in footnote 14, because, again, it

7    was describing loans that lenders want to make to the debtor

8    itself, not loans that they could make with the proceeds of a

9    foreclosure or in the marketplace to similarly situated

10   borrowers.  This is made clear by footnote 15 in Till, as well

11   as footnote 18 that I previously quoted.  Footnote 15 states

12   that the Court disagrees with the district court's coerced loan

13   approach, which "aims to set the cramdown interest rate at the

14   level the creditor could obtain from new loans of comparable

15   duration and risk."  541 U.S. at 477 n.15.  Moreover, as noted

16   before, the Court actually contemplated, in footnote 18,

17   literally no premium on top of the risk-free rate if it could

18   be determined with certainty that the debtor would complete the

19   plan. Id. 541 U.S. at 479 n.18.

20        In addition, there clearly was some form of market for

21   automobile loans to debtors like the debtors in the Till case.

22   That market, in fact, had a lot of data behind it. Id. 541 U.S.

23   at 481-82; 495 n.3 (dissenting opinion).  Nevertheless, the

24   Court felt constrained to refer to it as not a "perfectly

25   competitive market," Id. 541 U.S. at 481, for which Justice

1    Scalia's dissent somewhat berated the plurality. Id. 541 U.S.

2    at 494-95. Indeed, based on my experience reviewing hundreds,

3    if not thousands, of reaffirmation agreements and other matters

4    involving auto loans, there are and always have been active

5    markets for such loans, just as the value of cars and trucks is

6    tracked in readily accessible market guides.  Put differently,

7    there are far more lenders and borrowers for auto loans, with

8    access to more public data, than lenders and borrowers with

9    respect to DIP or exit financing in chapter 11 cases.  In this

10   case, for example, the evidence shows that there were only

11   three available exit lenders to the debtors, who eventually

12   combined on proposed backup takeout facilities while seeking to

13   keep confidential their fees and rate flex provisions.

14        This reality, as well as the fact that the plurality

15   in Till felt the need discount less than a "perfectly

16   competitive market," underscores, along with the rest of the

17   opinion, that footnote 14 is a very slim reed indeed on which

18   to require a market-based approach in contrast to every other

19   aspect of Till.  Certainly there is no meaningful difference

20   between the chapter 11, corporate context and the chapter 13,

21   consumer context to counter Till's guidance that courts should

22   apply the same approach wherever a present value stream of

23   payments is required to be discounted under the Code. Id. 541

24   U.S. at 474.  The rights of secured lenders to consumers and

25   secured lenders to corporations are not distinguished in Till,

1   nor should they be.  Nor does the relative size of the loan or

2   the value of the collateral matter under Till's  footnote 14,

3   as it should not.  Till does state that a chapter 13 trustee

4   supervises the debtor's performance of his or her plan, id. 541

5   U.S. at 477; however, with replacement notes overseen by an

6   indenture trustee for sophisticated holders, there will at

7   least be comparable supervision under the debtors' plan,

8   particularly in a district like this where secured claims often

9   are paid "outside" of chapter 13 plans and, therefore, the

10  chapter 13 trustee will not know whether the debtor has

11  defaulted on the secured debt post-confirmation.

12          In sum, then, footnote 14 should not be read in a way

13  contrary to Till and Valenti's first principles, which are,

14  instead of applying a market-based approach, a present value

15  cramdown approach using an interest rate that takes the profit

16  out, takes the fees out, and compensates the creditor under a

17  formula starting with a base rate that is essentially riskless,

18  plus up to a 1 to 3 percent additional risk premium, if any, at

19  least as against the prime rate, for the debtor's own unique

20  risks in completing its plan payments coming out of bankruptcy.

21          As I've stated, certain courts, nevertheless, have

22  required a two-step approach, that is, first inquiring whether

23  there is an efficient market, not for DIP loans, but for

24  financing generally for borrowers like the debtor, and only if

25  there is no such market, applying the formula approach as set

1    forth in Till and Valenti.

2         The leading case taking this approach is In re

3    American HomePatient, Inc., 420 F.3d 559 (6th Cir. 2005), cert.

4    denied, 549 U.S. 942 (2006).  It is clear from that case,

5    however, that prior to Till the Sixth Circuit, in contrast to

6    the Second Circuit, had applied the coerced-loan method, id. at

7    565-66, and then concluded that, given that Till was not on all

8    fours, it should continue to apply the coerced-loan approach

9    unless there was no efficient market. Id. at **568.**  This is, of

10   course, in contrast to this Court's duty to follow the guidance

11   offered by Valenti, as well as Till.

12        Other courts applying American HomePatient's two-step

13   approach include Mercury Capital Corp. v. Milford Connecticut

14   Associates, L.P., 354 B.R. 1, 11-2 (D. Conn. 2006) (remanding

15   to the bankruptcy court to make an efficient market rate

16   analysis); In re 20 Bayard Views LLC, 445 B.R. 83 (Bankr.

17   E.D.N.Y. 2011) (undertaking, after an eleven-day trial, a

18   market analysis before concluding that there was no efficient

19   market for Till purposes, and then applying the Till formula

20   approach); and In re Cantwell, 336 B.R. 688, 692-93 (Bankr. D.

21   N.J. 2006) (applying Till formula approach in the absence of

22   "an efficient market").

23        I conclude that such a two-step method, generally

24   speaking, misinterprets Till and Valenti and the purpose of

25   section 1129(b)(2)(A)(i)(II) of the Code based on the clear

1    guidance of those precedents.

2         Further, as noted by the Fifth Circuit in In re Texas

3    Grand Prairie Hotel Realty, L.L.C., 710 F.3d 324 (5th Cir.

4    2013), the first step of the two-step approach is almost, if

5    not always, a dead end.  As that decision observed, the vast

6    majority of cases have ultimately applied a Till prime-plus

7    approach or base rate-plus approach to the chapter 11 cramdown

8    rate, either having spent considerable time determining that

9    there is no efficient market or simply by moving to the base-

10   rate-plus formula in the first instance. Id. at 333-34 (citing

11   cases). This should not be surprising because it is highly

12   unlikely that there will ever be an efficient market that does

13   not include a profit element, fees and costs, thereby violating

14   Till and Valenti's first principles, since capturing profit,

15   fees and costs is the marketplace lender's reason for being.

16   That is, as acknowledged by counsel for the trustees in oral

17   argument, market lenders need to be rewarded, or to receive a

18   profit. (Moreover, the two-step approach has a perverse

19   underpinning: if the debtor is healthy enough to correspond to

20   borrowers who could receive comparable loans in the

21   marketplace, it would in all likelihood have to pay a higher

22   cramdown rate than under the Till and Valenti formula approach

23   for debtors who could not obtain a comparable loan in the

24   market.)

25        The indenture trustees nevertheless argue that the

1    debtors' case is unique, or at least highly unusual, in that

2    the debtors have substantially contemporaneously with

3    confirmation obtained backup loan commitments to fund the cash-

4    out alternative if the first lien and 1.5 lien holder classes

5    had voted to accept the plan. Specifically the debtors obtained

6    commitments for a $1 billion first lien backup takeout facility

7    and a bridge facility of $250 million.  Those commitments

8    provide for higher rates than the replacement notes under the

9    plan for the first and the 1.5 lien holders.

10         For the committed first lien backup takeout facility,

11   the rate is LIBOR plus 4 percent, with a floor for LIBOR of 1

12   percent. Because LIBOR is, at this time, approximately .15

13   percent, effectively this would be a five percent rate.  (There

14   is also an alternative base rate for this facility that, given

15   today's prime rate of approximately 3.25 percent, would be 6.25

16   percent, which is, however, exercisable at the debtors'

17   option.) The committed bridge facility provides for a rate of

18   LIBOR plus 6 percent, increasing in .5 percent increments every

19   three months, to a capped amount.  It appears relatively clear

20   that the debtors intend, if rates remain low, to take out that

21   facility before it increases precipitously.

22         The trustees have argued that these backup takeout

23   loans should be viewed as proxies for the Till formula rate,

24   even though -- or, according to the trustees, because -- they

25   are based on a market process, albeit one, as discussed above

1    that was relatively opaque and involved only three lenders who

2    ultimately combined to provide the commitments on a semi-

3    confidential basis.

4           Again, however, I believe that the trustees are

5    misreading Till and Valenti in their emphasis on the market.

6    In addition, it is clear to me that no private lender,

7    including the lenders who the debtors have obtained backup

8    takeout commitments from, would lend without a built-in profit

9    element, let alone recovery for costs and fees, which also, as

10   discussed above, is contrary to Till and Valenti's first

11   principles and the purpose of section 1129(b)(2)(A)(i)(II).

12          The indenture trustees state that I should assume that

13   all of the back-up lenders' profit is subsumed in the upfront

14   fees that are to be charged under the agreements, as well as an

15   availability fee, but they have not offered any evidence or

16   rationale for that proposition I decline to assume that there

17   is no profit element in the backup facilities' rates.  The

18   trustee also have offered no evidence of any profit element

19   that could be backed out of the back-up loans.  Therefore, I'm

20   left with the conclusion that there is, in fact, a profit

21   element which is unspecified and unquantified in the backup

22   loans, which, therefore, makes these two loans, even if I were

23   to accept a market-based approach, at odds with Till and

24   Valenti, as well as the courts that have followed Till in the

25   absence of any clear market for coercive loans and those courts

1    that have that followed Till or Valenti in a chapter 11 context

2    without considering markets at all, including In re Village at

3    Camp Bowie I LP, 454 B.R. 702, 712-13 (Bankr. N.D. Tex. 2011);

4    In re SW Boston Hotel Venture, LLC, 460 B.R. 38, 56 (Bankr. D.

5    Mass. 2011); In re Lilo Props., LLC, 2011 Bankr. LEXIS 4407, at

6    *3-6 (Bankr. D. Vt. Nov. 4, 2011); and In re Marfin Ready Mix

7    Corp., 220 B.R. at 158.

8         I conclude, therefore, that Till and Valenti's formula

9    approach is appropriate here, that is, that the debtors are

10   correct in setting the interest rates on the first and 1.5 lien

11   replacement notes premised on a base rate that is riskless, or

12   as close to riskless as possible, plus a risk premium in the

13   range of 1 to 3 percent, if at all, depending on the Court's

14   assessment of the debtors' ability to fully perform the

15   replacement notes.

16        The first and 1.5 lien trustees have next challenged

17   the debtors' analysis of the risk premium.  As noted, that risk

18   premium for the first lien replacement notes is 1.5 percent on

19   top of the seven-year Treasury note rate, and with respect to

20   the replacement notes for the 1.5 lien holders, it is 2 percent

21   on top of an imputed seven-and-one-half-year Treasury note

22   rate.  I believe that, in light of the factors to be considered

23   when deciding the proper risk premium under the Till and

24   Valenti formula approach, namely, the circumstances of the

25   debtors' estate, the nature of the security (both the

1    underlying collateral and the terms of the new notes), and the

2    duration and feasibility of the reorganization plan, the

3    debtors have also performed a proper analysis of the risk

4    premium.

5         The record on this issue consists primarily of the

6    declaration and testimony of Mr. Carter (the debtor's CFO), the

7    the expert reports and testimony of Mr. Derrough (the debtors'

8    investment banker), and the expert reports and testimony of Mr.

9    Augustine (the first lien trustee's investment banker) and the

10   expert reports of Mr. Kearns (the 1.5 lien trustee's investment

11   banker).

12        The only meaningful analysis of the debtors'

13   underlying economic condition and the only projections were

14   those undertaken by the debtors in the process testified to by

15   Mr. Carter and Mr. Derrough.  I conclude that such analysis and

16   projections resulted from a rigorous process based upon the

17   debtors' bottoms-up, as well as top-down, budgeting activity

18   for 2014, as well as the debtors' actual results for 2013.  The

19   process benefitted, I believe substantially, from the input not

20   only of Mr. Derrough and his team at Moelis, but also from

21   testing by the debtors' future shareholders, including the

22   members of the ad hoc committee of second lien holders and

23   Apollo, who have committed, with others, to invest $600 million

24   of equity in the reorganized debtors under the plan, in

25   addition to agreeing to receive only equity on account of their

1    notes.

2         Although there was considerable kibbitzing by Messrs.

3    Augustine and Kearns regarding the debtors' projections, they

4    engaged in no independent testing of them.  Nor did they engage

5    in a rigorous testing of those projections other than to point

6    out that in the past eight of nine years the debtors have

7    missed their projections, sometimes materially.  Those eight or

8    nine years of projections did not have the benefit of vetting

9    by Moelis and the second lien holders, however, that I have

10   discussed.  Nor have Messrs. Augustine and Kearns conducted a

11   valuation of the collateral or of the debtors as a going

12   concern, accepting, essentially, the debtors' valuations.

13        In addition, it was pointed out that the debtors have

14   missed their projections for the first quarter of this case,

15   where there was input from, I can assume, independent third

16   parties interested in making sure the projections were

17   accurate.  However, I found credible Mr. Carter's testimony on

18   this point (as I found Mr. Carter generally credible), which

19   was that those downward results for the post-bankruptcy period

20   were largely attributable to the effects of the bankruptcy

21   case, which would be ameliorated if not ended by the debtors'

22   emergence from bankruptcy and re-regularization of customer and

23   supplier relationships.

24        As far as the analysis is concerned, the post-

25   bankruptcy collateral coverage for the first and 1.5 lien

1   replacement notes is substantially better than the coverage in

2   the Till case.  Even with a twenty percent variance for each of

3   the five years of the debtors' projections, it appears clear

4   that the replacement notes would be repaid in full,

5   particularly given the fact that I have found that there will

6   be no make-whole amount included in the principal amount of the

7   loans.  Here, the first and 1.5 lien holders' new collateral

8   coverage, unlike in Till (where it was one-to-one, the debt

9   equaling the current value of the collateral, 541 U.S. at 470),

10  and unlike in In re 20 Bayard Views (where it also was one-to-

11  one with considerable execution risk, 445 B.R. at 112), has a

12  large cushion.  Here, the debt under the replacement notes is

13  approximately 50 to 75 percent less than the value of the

14  collateral therefor, and closer to 50 percent than 75 percent.

15  Gross debt leverage also will substantially decrease under the

16  plan, from 17.8 percent to 5.6 percent, or from $4.4 billion in

17  debt down to $1.3 billion.

18          In light of those considerations, as well as the

19  telling fact that there is a committed $600 million equity

20  investment under the plan, one can assume that, in the nature

21  of risk for debtors emerging from bankruptcy, the 1.5 and 2

22  percent factors chosen by the debtors are appropriate.

23          In response, the first and 1.5 lien trustees have not

24  carried their burden to show why those risk premiums are too

25  low.  First, in proposing their alternative risk premiums their

1   experts have focused on market data, again, which includes a

2   profit element.

3          In addition, they have not, as discussed above,

4   effectively challenged the debtors' projections or valuations.

5   They have pointed out the debtors' own disclosure of the risk

6   that they may lose some senior management upon confirmation of

7   the plan, although I assume that this risk was taken into

8   account in the debtors' projections and is, with all respect to

9   Mr. Carter and the other senior management team at the

10  financial level, less likely to occur for truly senior

11  management at the operational level, who might be harder to

12  replace.

13         In addition, it appears that both Messrs. Augustine

14  and Kearns have slanted their analysis in ways that undercut

15  their opinions.  Mr. Augustine has not provided any analysis

16  about collateral coverage for the replacement notes or total

17  enterprise value.  He also added extra interest into his

18  projections, in essence double counting, to set a gross debt

19  leverage amount that would then justify the extra interest.  He

20  also appears to have picked the very high end of leverage and

21  rate factors when stating that the market has, in the last two

22  months, materially changed, while these factors have since

23  adjusted downward (at least as of the confirmation hearing),

24  and has ignored the fact that the reorganized debtors' leverage

25  continually goes down under the debtors' projections, including

1    under the twenty percent per year down-side projection scenario

2    that Mr. Derrough ran, instead taking, in effect, a one-time

3    leverage snapshot at its peak.

4         Mr. Kearns, although not taking as many liberties as

5    Mr. Augustine, only focused on collateral leverage while

6    ignoring the $600 million equity investment and total debt

7    leverage.

8         Both experts for the first and 1.5 lien trustees also

9    referred to rates of default for notes on a market basis that

10   are rated, as they believe the replacement notes would be

11   rated, at B2B or B and referred to defaults of, in Mr. Kearns'

12   case, 34 percent in respect of such securities.  They did not

13   analyze, however, the difference between default and recovery

14   rates.   Clearly, the risk of default is an important risk to

15   consider in this type of analysis, but the more important risk

16   is the ultimate risk of non-payment (for example,

17   notwithstanding the debtors' bankruptcy, there is sufficient

18   committed backup takeout financing to pay the first and 1.5

19   lien holders' allowed claims in full in cash), which is where

20   collateral coverage and total debt leverage come into play and

21   support the debtors' analysis.

22        The experts for the first and 1.5 lien trustees have

23   also complained about the duration of the notes, although the

24   first lien replacement note's seven-year term is, in essence,

25   the remaining term of the present first lien notes, and the

1   risk differential attributable to the 1.5 lien replacement

2   notes' seven-and-a-half year maturity in Mr. Kearns' chart is

3   de minimis.

4        I also believe that once one takes out fees such as

5   pre-payment fees and other costs and similar covenants, the

6   covenants in the replacement notes for the first and the 1.5

7   lien holders are not materially different on an economic basis

8   from the covenants in the proposed backup takeout facilities.

9        Consequently, applying a formula of prime plus 1 to 3

10  percent, as I believe is appropriate under Till and Valenti

11  unless there are extreme risks that I believe do not exist

12  here, a risk premium of 1.5 and 2 percent, respectively, for

13  the two series of replacement notes is appropriate.

14       There is one point, however, on which I disagree with

15  the debtors' analysis. The debtors, consistent with Valenti,

16  105 F.3d at 64, and the well-reasoned Village at Camp Bowie

17  case, 454 B.R. at 712-15, chose as their base rate the

18  applicable or imputed Treasury note rate.  It was appropriate

19  for them to do this, rather than blindly following the prime

20  rate used in Till.  The Treasury note rate actually is, as both

21  Mr. Kearns and Mr. Derrough testified, often used as a base

22  rate for longer-term corporate debt such as the replacement

23  notes. The prime rate may, on the other hand, be a more

24  appropriate base rate for consumers, although Valenti chose the

25  Treasury rate, instead, perhaps because such loans are

1   considered to be essentially riskless.  Both rates of course

2   are easily determinable.  But the Treasury rate, as confirmed

3   by all three experts, does not include any risk, given that the

4   United States government is the obligor, whereas an element of

5   risk is inherent in the prime rate, which strongly correlates

6   to the interest rate banks charge each other on overnight

7   interbank loans and thus may reflect risks seen in banks'

8   financial strength, of stronger concern during the last few

9   years.

10          Given that fact, I question whether the 1 to 3 percent

11   risk premium spread over prime used in Till would be the same

12   if instead, as here, a base rate equal to the Treasury were

13   used.  I say this in particular under the present circumstances

14   where the prime rate for short-term loans is materially higher

15   than the Treasury rate for long-term loans, a somewhat

16   anomalous result.  It seems to me, then, that although the

17   general risk factor analysis conducted by Mr. Derrough was

18   appropriate, there should be an additional amount added to the

19   risk premium in light of the fact that the debtors used

20   Treasury rates as the base rate.  The additional increment, I

21   believe, should be another .5 percent for the first lien

22   replacement notes, and an additional .75 percent for the 1.5

23   lien replacement notes.  I believe that these adjustments

24   adequately take into account risks inherent in the debtors'

25   performance of the replacement notes above the essentially

1    risk-free Treasury note base rates.  Therefore, rather than

2    being the seven-year Treasury plus 1.5 percent, equaling 3.6 as

3    of August 26, 2014, the rate for the first lien replacement

4    notes should be the Treasury rate plus 2 percent, for an

5    overall rate of 4.1 percent as of such date; and the rate for

6    the 1.5 lien replacement notes should be the imputed seven-and-

7    a-half-year Treasury note rate plus 2.75 percent, or a 4.85

8    rate as of August 26, 2014.  This would require an amendment to

9    the plan, obviously, and I don't know whether the necessary

10   parties would agree to it, but I believe that they should,

11   because it is necessary to cram down the plan over the

12   objection of the first and 1.5 lien holder classes.

13

14          That leaves one remaining issue, which is the

15   confirmability of the plan in light of the plan's third-party

16   release and injunction provisions.  Those provisions have not

17   been objected to except for the first and 1.5 lien trustees'

18   objection to the inclusion of third-party releases for parties

19   named or identified in state court lawsuits brought by the

20   first and 1.5 lien trustees to enforce the terms of the

21   Intercreditor Agreement on the second lien holders. (Those

22   lawsuits have been removed to this Court, although remand

23   motions are pending.)  The second lien holder third parties

24   covered by the plan's release and injunction provisions are

25   referred to here as the "Released Second Lienholders").

1          While it is true that third-party releases and related

2     injunctions in Chapter 11 plans and confirmation orders are,

3     under the law of the Second Circuit, proper only in rare

4     cases, see Deutsche Bank AG v. Metromedia Fiber Network, Inc.,

5     416 F.3d 136, 141 (2d Cir. 2005), if they are consensual or are

6     not objected to after proper notice, courts generally approve

7     them unless they are truly overreaching on their face.  I do

8     not find anything truly offensive in these releases and, thus,

9     to the extent that they have not been objected to or a party

10    voted in favor of the plan or did not opt out notwithstanding

11    the clear notice in the ballot that stated, in upper-case

12    letters, "If you voted to reject the plan and you did not opt

13    out of the release provisions by checking the box below, or if

14    you voted to accept the plan regardless of whether you checked

15    the box below, you will be deemed to have conclusively,

16    absolutely, unconditionally, irrevocably and forever released

17    and discharged the Released Parties from any and all claims and

18    causes of action to the extent provided in Section 12.5 of the

19    plan," the plan may be confirmed consistent with both

20    Metromedia and the case law interpreting it, as summarized by

21    Judge Lane in In re Genco Shipping & Trading, Ltd., 513 B.R.

22    233 (Bankr. S.D.N.Y. 2014).

23         It is another story, however, where there is a

24    substantial objection to a third-party release and related

25    injunction, which is the case here, albeit that it is by a

1    group that at least under the ruling that I just gave, would be

2    satisfied as a matter of law by a plan that would be consistent

3    with my cramdown ruling (which is one of the factors arguing

4    for a release's effectiveness under the caselaw that I have

5    cited).

6              Here, what was originally sought to be released

7    included claims made by the first and 1.5 lien trustees against

8    the Released Second Lienholders in the litigation that has been

9    removed to this Court.  In that litigation, the first and 1.5

10   lien trustees assert a breach claim under the Intercreditor

11   Agreement based on the Released Second Lienholders' support of

12   the plan and receipt of consideration under the plan before the

13   payment to the holders of the first and 1.5 liens required by

14   the Intercreditor Agreement, which, they contend, under the

15   agreement's definition of "discharge of indebtedness," is

16   payment in full, in cash.

17             In light of comments made during the confirmation

18   hearing regarding my concerns about the proposed release as it

19   applied to the Released Second Lienholders, the debtors and

20   those released parties have agreed, however, to amend the plan

21   to carve out of the release of rights with respect to, and the

22   discharge of, the pending litigation, provided that the Court

23   maintains jurisdiction over that litigation.

24             I conclude, having evaluated the factors under

25   Metromedia and the case law supporting third-party plan

1    releases -- and, though not fully, having reviewed the

2    litigation claims against the Released Second Lienholders --

3    that this modified release is appropriate and would be

4    sustained if the plan were otherwise confirmable.

5         It is is clearly the case that the Released Second

6    Lienholders are providing substantial consideration under the

7    plan.  They are agreeing not to seek pari passu treatment on

8    their deficiency claims with the trade creditors (that is, all

9    creditors with unsecured claims with the exception of the

10   senior subordinated unsecured noteholders), who are being paid

11   in full under the plan.

12        They are also committing to underwrite the $600

13   million equity investment under the plan.  They have also

14   supported confirmation of the plan starting with executing a

15   prepetition plan support agreement (although I agree with Judge

16   Lane's conclusion in Genco Shipping & Trading that one cannot

17   bootstrap a plan support agreement containing an

18   indemnification right into consideration for a third-party

19   release under a plan).

20        I also believe that the third-party release is an

21   important feature of this plan.  Counsel for the indenture

22   trustees, in essence, asked me to play a game of chicken with

23   the Released Second Lienholders (beyond my comments that led to

24   the on-the-record amendment of the release) to see if they

25   actually would withdraw their support of the plan if the plan

1    and confirmation order were not reasonably satisfactory to

2    them, by requiring the full deletion of the release, but I'm

3    not prepared to do that.  I believe that, instead, I can assess

4    the likelihood that the Released Second Lienholders would walk

5    as well as Mr. Carter on behalf of the debtors did, and assume,

6    like Mr. Carter, that there is a reasonable risk that if this

7    release, as modified on the record, did not remain in the plan,

8    the Released Second Lienholders would withdraw their support of

9    the plan.  This reasonable risk is especially significant,

10   moreover, given all that the Released Second Lienholders have

11   committed to do under the plan.

12            Nevertheless, I think that the released parties'

13   substantial consideration should be weighed against, in some

14   measure, the claims that are being asked to be released and,

15   where they're being actively pursued, as is the case with the

16   carved-out litigation, ensure that such claims are not

17   frivolous or back-door attempts to collect from the reorganized

18   debtors notwithstanding the discharge.  Thus, I believe that it

19   is appropriate to maintain jurisdiction over such litigation,

20   as provided in the modified release, for the same reasons that

21   Judge Gerber has discussed in a number of opinions, including

22   In re BearingPoint, Inc., 453 B.R. 486 (Bankr. S.D.N.Y. 2011),

23   and In re Motors Liquidation Company, 447 B.R. 198 (Bankr.

24   S.D.N.Y. 2011): that, in order to be able to sort out whether a

25   suit is, in large measure, a strike suit or looking to get a

1   recovery from the reorganized debtor through the artifice of

2   proceeding against a third party or, on the other hand, sets

3   forth a genuine claim that would not be covered by the

4   bankruptcy plan or for which there's not sufficient value being

5   provided by the released parties, the court should, at a

6   minimum, keep jurisdiction over the matter.  This also avoids

7   the potential for conflicting orders in different courts and

8   the assertion in other courts of positions notwithstanding the

9   doctrines of collateral estoppel and res judicata, which, based

10  on oral argument, I have serious concerns over here.  And I do

11  not believe that the Released Second Lienholders or other

12  courts should be subjected to a potentially multi-court process

13  with respect to the pending Intercreditor Agreement litigation

14  and enforcement of this Court's confirmation order.

15          I also should note, because this was raised in the

16  objection, that I firmly believe that I have jurisdiction over

17  this issue for the reasons that I stated at the beginning of

18  this ruling, and that I can issue a final order on it within

19  the confines of Stern v. Marshall, given that this is in the

20  context of the confirmation of the plan, and pertains

21  ultimately to the debtors' rights under the Bankruptcy Code.

22  That would hold true, even post-confirmation or with regard to

23  a post-confirmation effect on the estate.  See, for example, In

24  re Quigley Company, 676 F.3d 45, 53 (2d Cir. 2012), cert.

25  denied, 133 C. Ct. 2849 (2013); In re Chateaugay Corp., 213

```
 1   B.R. 633, 637-38 (S.D.N.Y. 1997), and In re Lombard-Wall, Inc.,

 2   44 B.R. 928, 935 (Bankr. S.D.N.Y. 1984).

 3            So, were the plan to be amended as I have said I would

 4   find to be appropriate with regard to the cramdown interest

 5   rates, I would confirm the plan as it otherwise stands,

 6   including the amended release provision.

 7            I believe that covers all of the outstanding

 8   confirmation issues.  As I said before, to the extent that

 9   these issues also overlap with issues that have been raised in

10   the three adversary proceedings covered by the confirmation

11   procedures order, those issues have been decided at this time

12   as well; therefore, I need an order in those proceedings,

13   regardless of what you do with amending the plan.

14
     Dated:  White Plains, New York
15           September 9, 2014

16                         /s/ Robert D. Drain_____ _____
                           United States Bankruptcy Judge
17

18

19

20

21

22

23

24

25
```